### TEACHERS INSURANCE AND ANNUITY ASSOCIATION OF AMERICA, Plaintiff,

v.

### TRIBUNE COMPANY, Defendant.

**No. 83 Civ. 0047 (PNL).**

United States District Court, S.D. New York.

May 27, 1987.

As Amended June 26, 1987.

Fried, Frank, Harris, Shriver & Jacobson, New York City (Marc P. Cherno, Robert E. Gerber, Mary C. Farrington, of counsel), for plaintiff.

Patterson, Belknap, Webb & Tyler, New York City (Eugene L. Girden, Lynn P. Freedman, Blair Axel, Stephen P. Younger, of counsel), for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEVAL, District Judge.

This action is brought by an institutional lender against a prospective borrower charging the borrower with breach of a commitment letter agreement for a 14–year $76 million loan yielding 15.25%. The exchange of letters constituting the commitment agreement stated that the borrower and lender had made a "binding agreement," to borrow and to lend on the agreed terms, subject to the preparation and execution of final documents satisfactory to both sides and the approval of the borrower's Board of Directors. Prior to the preparation of final agreements the borrower broke off negotiations, declining to negotiate further unless the lender agreed that the borrower's obligation to borrow would be contingent on its ability to report the loan on its financial statement by an off-balance-sheet offset. The lender contends the borrower's withdrawal was attributable to an intervening decline in interest rates which permitted the borrower to secure funds at a much lower cost than agreed in the commitment letter. The borrower contends that the change in interest rates had nothing to do with its refusal to go ahead and that the availability of offset accounting had always been understood to be a condition of the loan. It contends also that its acceptance of the commitment reserving

right of approval to its Board of Directors left it free to decline to take down the loan if the loan did not serve its interest.

*Facts*

The borrower is Tribune Company, a Chicago communications enterprise which owned the New York Daily News. The lender is Teachers Insurance and Annuity Association of America, a large non-profit tax exempt organization that provides pension annuities and insurance programs to educational institutions. The contemplated loan was an element of a three-cornered arrangement for the sale by Tribune of the Daily News Building at 220 E. 42nd Street in New York.

For some time, Tribune had been contemplating the possibility of outright sale of the News. The Morgan Guaranty Trust Company of New York prepared a memorandum recommending to Tribune that it structure a deal in which the purchaser's payment would be deferred, and Tribune would borrow equivalent funds from a financial institution under terms that permitted Tribune the right to repay its borrowing by assigning the purchaser's installment note to the lending institution. (DX 1–4.) This device was designed to secure installment tax deferral of Tribune's gain, notwithstanding immediate realization of the full proceeds of the sale through the loan. And because its borrowing could be repaid by tender of the purchaser's note, Tribune's debt could be offset against its receivable and reported off-balance-sheet in the notes to its financial statement.

In the spring of 1982 Tribune dropped the plan to sell the News. Instead, it restructured the News subsidiary, which occasioned a nonrecurring tax loss of $75 million. To raise cash that was needed for a number of purposes including the operations of the News, Tribune decided to sell the News Building which would no longer be needed in the restructured operation.

Tribune entered into negotiations to sell the Building to LaSalle Partners, a Chicago real estate firm, with Tribune retaining an equity interest. It was important that the transaction be accomplished during the calendar year 1982 so that the loss realized from the restructuring of the News could be offset against taxable gain realized from the sale of the News Building. A suggestion was made to adapt to the sale of the Building the proposal which Morgan had made with respect to the contemplated sale of the *News*. A substantial portion of the purchase price would be deferred: LaSalle would deliver to Tribune a non-recourse long-term (35 year) purchase money mortgage note. (As the equity "kicker", this mortgage would give the mortgagee not only conventional interest payments but also a percentage of the operating profits of the building.) Tribune would "match-fund" the mortgage, *i.e.*, it would borrow from a third party in an amount approximately equal to the mortgage note. The loan agreement would give Tribune an unconditional right to satisfy its obligation to repay by putting to the lender the mortgage note which Tribune received for its sale of the building. To compensate the lender for the additional risk inherent in the possible put of the mortgage, Tribune would pay a premium above the market interest rate.

In this manner, Tribune would realize only so much gain as it could set off against its 1982 tax loss. The taxability of the remainder of its gain would be deferred by reason of the installment sale. At the same time, through the loan, Tribune would obtain immediate use of the full purchase price in cash. It would not be obliged to carry the borrowing as a liability on its balance sheet: by reason of its right to put its mortgage receivable to the lender in satisfaction of the debt, it could employ offset accounting, setting off the asset represented by the purchase money notes against the liability to the lending institution, eliminating both from its balance sheet, and describing them rather in the footnotes to the financial statements.

The use of offset accounting was important to Tribune. Up to this point, its common stock had been privately held. It was now contemplating a public offering and believed that the market for its shares would be adversely affected if it were re-

quired to carry so large a liability on its balance sheet.

In August, Tribune prepared an offering brochure to be shown to prospective lenders. This was a document of about 50 pages, describing the proposed mortgage and loan, together with financial information about Tribune and the Building. The brochure included two term sheets—one describing the proposed purchase money mortgage Tribune would receive upon the sale of the Building, the other giving the terms of its proposed match-fund borrowing.

Tribune's advisers believed that only a small number of institutions would have the means and flexibility to contemplate a loan of these specifications. Together with LaSalle, Tribune prepared a list of six institutions including Teachers. The other five promptly rejected the deal.

Gary Waterman of LaSalle called Martha Driver of Teachers to discuss the concept. Driver told him that Teachers would be interested in receiving a proposal from Tribune. On August 20 Scott Smith, the Vice President and Treasurer of Tribune, sent Driver the offering circular. (DX 5.) Smith's covering letter stated:

> Our objective is to "match fund" this PMM [purchase money mortgage] so that we can obtain cash equivalent to the PMM's value while maintaining the tax deferral and the upside potential associated with the cash flow participation feature. A second objective is to avoid showing both the PMM and match funding on our balance sheets since conceptually these real estate loans are not related to our basic businesses.

> According to our advisers, we can meet these objectives by adding a "put" or alternative payment option to the private placement.... [giving] Tribune Company the unconditional right, at any time, to assign the PMM to the private placement lender in full satisfaction of its obligations under the Notes.

The letter went on to state that "[t]he likelihood of the 'put' being exercised is very low because of the 'penalties' Tribune would incur through loss of the tax defer-

ral and the value of the cash flow participation." Finally, Smith's letter stated, "While we are flexible on funds delivery, our objective is to have a *firm commitment* from a lender by September 15, 1982. Consequently, we need to move the due diligence and negotiation process along very quickly." (Emphasis supplied.)

In the next weeks discussions proceeded promptly between Teachers and Tribune, with Teachers' representatives making due diligence visits to Tribune. Teachers requested and Tribune agreed to an additional ¼% yield. Both sides agree that during these meetings Smith talked about Tribune's desire to use offset accounting. Driver testified that she told Smith Teachers could not make a commitment if the deal were conditioned on Tribune's ability to use a particular method of accounting. Smith denies that Driver made any such statement. Both agree that Smith spoke of Tribune's urgent need for a commitment by September 15. Driver told Smith that the commitment could not be issued before approval by Teachers' Finance Committee which would not meet until September 16. This brief delay was acceptable to Tribune.

The loan had attractive features for Teachers: It was satisfied with Tribune as a credit risk; it would receive a premium over market interest rates to compensate it for the additional risk of being paid by tender of a long-term mortgage rather than in cash; nonetheless, absent catastrophic changes, Tribune was unlikely to exercise the right to tender the mortgage, because by doing so it would give up the tax deferment as well as its participation in the profits of the building; furthermore, an independent appraisal delivered by Tribune to Teachers valued the building at $150 million or nearly double the amount of the loan, providing a comfortable cushion of protection in the mortgaged collateral.

On September 16th, Teachers Finance Committee met and approved the Tribune loan. Driver promptly called Smith, gave him the good news, and told him that Teachers would issue its commitment letter promptly. Tribune's Assistant Treasurer wrote to Driver, "We look forward to re-

ceiving your commitment letter next week...." (DX 46.) Driver promptly undertook the drafting of Teacher's commitment letter.

The letter, mailed on September 22, included a two page Summary of Proposed Terms drawn from the term sheet included in Tribune's Offering Circular and the ensuing conversations. Teacher's term sheet covered all the basic economic terms of a loan. Neither the term sheet nor the covering commitment letter made reference to offset accounting. The letter stated that the agreement was "contingent upon the preparation, execution and delivery of documents ... in form and substance satisfactory to TIAA and to TIAA's special counsel ...," and that the transaction documents would contain the "usual and customary" representations and warranties, closing conditions, other covenants, and events of default "as we and our special counsel may deem reasonably necessary to accomplish this transaction." It concluded by inviting Tribune to "evidence acceptance of the conditions of this letter by having it executed below by a duly authorized officer ...," and finally stated:

> Upon receipt by TIAA of an accepted counterpart of this letter, our agreement to purchase from you and your agreement to issue sell and deliver to us ... the captioned securities, shall become a binding agreement between us. (DX 13.)

When Tribune received this commitment letter, the "binding agreement" language caused serious concern to its lawyers. Tribune's outside counsel, Alfred Spada of the firm of Reuben & Proctor, advised Smith not to sign a letter containing "binding agreement" language.[1] But, having been turned down by five other institutions, Smith did not want to risk losing Teacher's commitment. He made no comment orally or in writing to Teachers questioning the "binding agreement" language. He executed and returned the letter on behalf of Tribune Company adding the notation that it was subject to certain modifications outlined in his accompanying letter. In the accompanying letter Smith wrote,

> [O]ur acceptance and agreement is subject to approval by the Company's Board of Directors and the preparation and execution of legal documentation satisfactory to the Company.[2] (DX 14.)

Smith's acceptance letter made no mention of offset accounting.

During October Tribune proceeded with negotiations on two fronts to conclude the sale of the News Building to LaSalle and the consummation of the loan from Teachers. Tribune's lawyers had advised that in order to assure the desired tax deferral these negotiations should be conducted separately and no direct negotiation should occur between Teachers and LaSalle. The document which pertained to both transactions was the purchase money mortgage, which would be given by LaSalle to Tribune to secure its deferred payment, and could eventually be put by Tribune to Teachers in satisfaction of its obligations under the loan. As the negotiations over the mortgage proceeded, Tribune found itself pulled between the conflicting interests of its counterparties. LaSalle, as purchaser of the building, wanted a mortgage that would allow little interference by the mortgagee in the operation of the building; such mortgages are characteristically given in purchase money transactions, and Tribune, as seller, was willing to agree to such loose terms. Teachers, on the other hand, as the possible eventual holder of the mortgage, was interested in terms characteristic of institutional mortgages that give the mortgagee substantial control over the

---

1. A few days before Tribune had entered into a letter of intent with LaSalle for the sale of the building which, in contrast, expressly provided that it was "not a binding agreement." (DX 10.)

2. Smith's acceptance letter also revised the terms of the loan in a cosmetic, economically nonsignificant manner. Reuben & Proctor had advised Tribune that in order to protect the tax deferral, the terms of the match-fund note should not mirror too closely the terms of the purchase money mortgage. Accordingly, Smith had proposed to Driver that certain cosmetic adjustments without economic significance be made to the terms so as to better protect Tribune's tax objective. Teachers agreed. Par amount and term were slightly reduced, while coupon rate was slightly increased so as to leave the effective yield unchanged.

mortgagor's operation of the building. LaSalle and Teachers each served on Tribune adamant objections to the other's position. Tribune ferried these objections from one set of negotiations to the other.

A second subject of controversy in the negotiations between Tribune and Teachers was conditions on Tribune's put of the mortgage. Teachers expressed concern over a variety of problems: First, it worried that the mortgage might already be in default when put to Teachers; it sought to include as a condition of exercise of the put that the mortgage not be in default. Second, because the purchase money mortgage gave the mortgagee an equity participation in the profits of the building, Teachers worried that its possession of such a mortgage might give it "unrelated business income" that would threaten its tax exempt status. It also worried that such a mortgage might not be a legal holding for it at the time of exercise of the put, fourteen years hence. Teachers sought terms that would make Tribune's right to put the mortgage conditional on these issues being resolved to Teachers' satisfaction at the time of exercise. Tribune insisted that its right to put the mortgage to Teachers must be unconditional. Tribune believed that without an unconditional right to tender the mortgage in full satisfaction of the loan, Tribune could not justify offset accounting.

Eventually, because of the urgent need to conclude the sale of the building during the tax loss year, Tribune decided to conclude its negotiations with LaSalle, deferring the issue of Teachers satisfaction. Tribune entered into final binding agreements with LaSalle for the sale of the News Building on November 5. (DX 22.) The agreement was substantially on the terms reflected in the offering circular that Tribune had delivered to Teachers in August.

Tribune's board was scheduled to meet on October 28th. Tribune's negotiators had advised Teachers that formal board approval would be obtained at that meeting. At this meeting, Tribune's board passed resolutions which approved the sale of the Building to LaSalle. With respect to the Teachers loan, the Minutes of the meeting state that the Chairman "requested that the Board authorize the Finance Committee to approve the terms of such borrowing should the loan become available to the Company;" and that, following discussion, resolutions were adopted "that the proper officers of the Company be and they hereby are authorized" to effect the borrowing "with all of the actual terms and conditions to be subject to the prior approval by resolution of the Finance Committee." (DX 19.)

During the month of November, Tribune's accountants Price Waterhouse became worried about the availability of offset accounting. Prior to the delivery of the commitment letter, on September 7, Price Waterhouse had given Tribune an opinion letter that an unconditional option to put the mortgage note to the lender in full satisfaction of Tribune's obligation to repay the borrowing "allows (but does not require)" Tribune to offset its mortgage note receivable against its note payable. (DX 7.) In the meantime, in mid-October, the Financial Accounting Standards Board (FASB) had issued an exposure draft dealing with the appropriateness of offsetting restricted assets against related debt. (DX 25.) The exposure draft underlined the problem that the conditions Teachers had been seeking to impose on Tribune's exercise on the put were incompatible with offset accounting. In addition, Price Waterhouse began to worry that if Tribune proceded to offer securities to the public, as it was planning, the SEC in passing on Tribune's registration statement might ask Price Waterhouse for an opinion as to whether offset accounting was "preferable." Although Price Waterhouse believed an unconditional put option would make offset accounting "appropriate," it had doubts whether it could give the opinion that such an accounting was "preferable" and whether, without such an opinion, the SEC would permit the liability to be kept off the balance sheet.

Smith called Driver and expressed Tribune's concerns about the accounting issue. Meetings and discussions were held during

November concerning Tribune's dissatisfaction with the conditions Teachers had demanded as to the put, the availability of offset accounting, and Teachers' problems with the terms of the mortgage.

In the meantime, interest rates had dropped rapidly, and were now substantially below the rates that prevailed when Teachers and Tribune had entered into the commitment. Driver became concerned that Tribune, which could now make a new deal to borrow at substantially cheaper rates, was seeking to back out of the transaction. Having heard nothing about the actions of Tribune Board at its meeting on October 28, she inquired of Smith whether Board approval had been voted. Smith answered to the effect that the Board had given "general approval" to the transaction.

Around December 2 Smith began to advance proposals varying the form of the transaction. He suggested delaying Tribune's take-down, paying Teachers a commitment fee in the meantime, and specifying that Tribune would not go ahead with the proposed loan if it did not receive assurance as to the availability of offset accounting. Teachers indicated flexibility as to delaying the take-down in return for a commitment fee, but not as to making the deal conditional on Tribune's accounting.

On December 6th Tribune closed with LaSalle on the sale of the building. The mortgage was executed. Teachers began to press Tribune to meet with it to put the loan documents into final form. Teachers dropped its demand for conditions on the exercise of the put that had been unacceptable to Tribune. It asked for Tribune's comments on the draft note which it had circulated on December 1. Driver asked Smith to schedule a meeting to iron out all open issues. But the drop in interest rates together with doubts as to the availability of offset accounting now made the deal much less attractive to Tribune. Smith responded that there was no point having a meeting unless Teachers were willing to make Tribune's obligation conditional on the availability of offset accounting. Driver told Smith that Tribune's satisfaction as

to its accounting was not part of their deal. Teachers sent Tribune an unsolicited letter extending Teachers' commitment for another 30 days. Tribune exhibited no further interest in pursuing the transaction. Teachers then brought the suit.

### Discussion

The primary contested issue is as to the nature of the obligations that arose out of the commitment letter agreement:

Tribune contends that although the commitment letter was an undertaking to negotiate, it did not obligate either side to enter into a loan contract that was adverse to its interest. Pointing out that the commitment letter agreement left many terms open, that both sides had reserved the right of approval of satisfactory documentation, and that Tribune had furthermore made its obligation conditioned on the approval of its Board of Directors, it argues that it had no binding commitment to the loan agreement, especially if it found the terms adverse to its interests.

Teachers argues that although the commitment letter did not constitute a concluded *loan agreement,* it was nonetheless a binding commitment which obligated both sides to negotiate in good faith toward a final contract conforming to the agreed terms; it thus committed both sides not to abandon the deal, nor to break it by a demand that was outside the scope of the agreement. Although Teachers recognizes that the letter agreement left many points unspecified, it argues that the open terms were of minor economic significance and were covered by the provision that "[t]he documents shall contain such representations and warranties, closing conditions, other covenants, events of default and remedies, requirements for delivery of financial statements, and other information and provisions *as are usual and customary in this type of transaction....*" (Emphasis supplied.) (DX 13.) It argues that these minor open terms did not render the contract illusory or unenforceable. Nor did they indicate an intention of the parties not to be bound when taken together with the express language of "binding agreement."

Although it was of course possible for the deal to break without liability on either side by reason of inability of the parties to reach agreement on the open terms, Teachers argues that neither side was free to break the deal over conditions which were either inconsistent with the agreed terms or outside the scope of provisions that would be "usual and customary in this type of transaction." (DX 13.)

There has been much litigation over preliminary agreements. It is difficult to generalize about their legal effect. They cover a broad scope ranging in innumerable forms and variations from letters of intent which presuppose that no binding obligations will be placed upon any party until final contract documents have been signed,[3] to firm binding commitments which, notwithstanding a need for a more detailed documentation of agreement, can bind the parties to adhere in good faith to the deal that has been agreed.[4] As is commonly the case with contract disputes, prime significance attaches to the intentions of the parties and to their manifestations of intent. Labels such as "letter of intent" or "commitment letter" are not necessarily controlling although they may be helpful indicators of the parties' intentions. Notwithstanding the intention of the parties at the time, if the agreement is too fragmentary, in that it leaves open terms of too fundamental importance, it may be incapable of sustaining binding legal obligation.[5] Furthermore, the conclusion that a preliminary agreement created binding obligations does not necessarily resolve disputes because it leaves open the further question of the nature, scope and extent of the binding obligations.

A primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended. Ordinarily in contract negotiation, enforceable legal rights do not arise until either the expression of mutual consent to be bound, or some equivalent event that marks acceptance of offer. Contractual liability, unlike tort liability, arises from consent to be bound (or in any event from the manifestation of consent). It is fundamental to contract law that mere participation in negotiations and discussions does not create binding obligation, even if agreement is reached on all disputed terms. More is needed than agreement on each detail, which is overall agreement (or offer and acceptance) to enter into the binding contract.[6] Nor is this principle altered by the fact that negotiating parties may have entered into letters of intent or preliminary agreements if those were made with the understanding that neither side would be bound until final agreement was reached. The Court of Appeals in several recent cases has stressed the importance of recognizing the freedom of negotiating parties from binding obligations, notwithstanding their having entered into various forms of non-binding preliminary assent.[7] Those decisions have underlined various indicia that can be helpful in making the determination whether a manifestation of preliminary assent amounted to a legally binding agreement.

Notwithstanding the importance of protecting negotiating parties from involun-

---

3. *See, e.g., Dunhill Securities Corp. v. Microthermal Applications, Inc.,* 308 F.Supp. 195 (S.D.N.Y. 1969); *Brause v. Goldman,* 10 A.D.2d 328, 199 N.Y.S.2d 606 (1st Dept.1960), *aff'd,* 9 N.Y.2d 620, 210 N.Y.S.2d 225, 172 N.E.2d 78 (1961).

4. *See e.g., Teachers Insurance Annuity Association v. Butler,* 626 F.Supp. 1229 (S.D.N.Y.1986) (Weinfeld, J.); *Mid-Continent Telephone Corp. v. Home Telephone Co.,* 319 F.Supp. 1176 (N.D. Miss.1970); *see also Arnold Palmer Golf Co. v. Fuqua Industries, Inc.,* 541 F.2d 584 (6th Cir. 1976); *Itek Corp. v. Chicago Aerial Industries, Inc.,* 248 A.2d 625 (Del.1968); *Corbin on Contracts* § 29 (1952).

5. *See Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher,* 436 N.Y.S.2d 247, 249 (1981); *Candid Productions, Inc. v. International Skating Union,* 530 F.Supp. 1330, 1333–34 (S.D.N.Y. 1982) (Weinfeld, J.).

6. *See Reprosystem v. SCM Corp.,* 727 F.2d 257 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

7. *See Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78 (2d Cir.1985); *R.G. Group v. Horn & Hardart Co.,* 751 F.2d 69 (2d Cir.1984); *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257 (2d Cir.), *cert. denied,* 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984).

tary judicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation.[8] It is, of course, the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties.[9]

Preliminary contracts with binding force can be of at least two distinct types. One occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation. Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable. As the Court of Appeals stated with respect to such preliminary agreements in *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969), "the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.... Restatement (Second) of Contracts, § 26 (then Tert. Draft No. 1, 1964); 1 Corbin on Contracts § 30 (1950); 1 Williston on Contracts § 28 (3d ed. 1957)."

The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement.[10] To differentiate this sort of preliminary agreement from the first, it might be referred to as a binding preliminary commitment. Its binding obligations are of a different order than those which arise out of the first type discussed above. The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. The second type—the binding preliminary commitment—does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework. In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. In the second type, he may not. What he may demand, however, is that his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract. It is also possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation. The obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.

It may often be difficult for a court to determine whether a preliminary manifestation of assent should be found to be a binding commitment. The factors mentioned by the Court of Appeals in *Winston*, 777 F.2d 78, and *R.G. Group*, 751 F.2d 69, as relevant to a determination whether final contracts had been reached in preliminary form are also relevant to determina-

**8.** *Cf. Washington Heights-West Harlem-Inwood Mental Health Council, Inc. v. District 1199*, 748 F.2d 105 (2d Cir.1984).

**9.** *See Corbin on Contracts* § 29 (1952).

**10.** *See Channel Home Centers, Division of Grace Retail Corp. v. Grossman*, 795 F.2d 291 (3d Cir. 1986); *Butler*, 626 F.Supp. 1229; *Sommer v. Hilton Hotels Corp.*, 376 F.Supp. 297 (S.D.N.Y. 1974).

tion whether preliminary commitments are to be considered binding. But, for this different inquiry, the factors must be applied in a different way. For example, in *R.G. Group*, 751 F.2d at 76, the court identified the third factor as "whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." The existence of open terms is always a factor tending against the conclusion that the parties have reached a binding agreement. But open terms obviously have a somewhat different significance where, unlike *R.G. Group*, the nature of the contract alleged is that it commits the parties in good faith to negotiate the open terms. To consider the existence of open terms as fatal would be to rule, in effect, that preliminary binding commitments cannot be enforced. That is not the law.

In seeking to determine whether such a preliminary commitment should be considered binding, a court's task is, once again, to determine the intentions of the parties at the time of their entry into the understanding, as well as their manifestations to one another by which the understanding was reached. Courts must be particularly careful to avoid imposing liability where binding obligation was not intended. There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents. Nonetheless, if that is what the parties intended, courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations.

Giving legal recognition to preliminary binding commitments serves a valuable function in the marketplace, particularly for relatively standardized transactions like loans. It permits borrowers and lenders to make plans in reliance upon their preliminary agreements and present market conditions. Without such legal recognition, parties would be obliged to expend enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms. At the same time, a party that does not wish to be bound at the time of the preliminary exchange of letters can very easily protect itself by not accepting language that indicates a "firm commitment" or "binding agreement."

\* \* \*

Upon careful consideration of the circumstances and the express terms of this commitment letter, I conclude that it represented a binding preliminary commitment and obligated both sides to seek to conclude a final loan agreement upon the agreed terms by negotiating in good faith to resolve such additional terms as are customary in such agreements. I reject Tribune's contention that its reservation of the right of approval to its Board of Directors left it free to abandon the transaction.

*Expression of Intent*

The Court of Appeals' first and most important factor looks to the language of the preliminary agreement for indication whether the parties considered it binding or whether they intended not to be bound until the conclusion of final formalities. This factor strongly supports Teachers. The exchange of letters constituting the commitment was replete with the terminology of binding contract, for example:

> If the foregoing properly sets forth your understanding of this transaction, please evidence acceptance of the conditions of this letter by having it executed below by a duly authorized officer ... and by returning one executed counterpart. ...

> Upon receipt by [Teachers] of an accepted counterpart of this letter, our agreement to purchase from you and your agreement to issue, sell and deliver to us ... the captioned securities, shall become a binding agreement between us.

In signing, Tribune used the words "Accepted and agreed to." Tribune's additional letter of acceptance began "Attached is an executed copy of the Commitment Letter ... for a $76 million loan." The intention to create mutually binding contractual obligations is stated with unmistakable clarity, in a manner not comfortably com-

patible with Tribune's contention that either side was free to walk away from the deal if it decided its interests were not served thereby.

Tribune argues that this language of binding agreement was effectively contradicted by its statement that "our acceptance and agreement is subject to approval by the Company's Board of Directors and the preparation and execution of legal documentation satisfactory to the Company," as well as by similar reservations in Teachers' letter.

Contracts of preliminary commitment characteristically contain language reserving rights of approval and establishing conditions such as the preparation and execution of documents satisfactory to the contracting party. Although such reservations, considered alone, undoubtedly tend to indicate an intention not to be finally bound, they do not necessarily require that conclusion. Such terms are not to be considered in isolation, but in the context of the overall agreement. Such terms are by no means incompatible with intention to be bound. Since the parties recognize that their deal will involve further documentation and further negotiation of open terms, such reservations make clear the right of a party, or of its Board, to insist on appropriate documentation and to negotiate for or demand protections which are customary for such transactions. In *Reprosystem,* 727 F.2d at 262, and *R.G. Group,* 751 F.2d at 75, the court reasoned that a term stating the agreement would be effective "when executed" could conclusively establish that no binding force was intended prior to execution. That reasoning is of diminished force, however, where the inquiry is not whether the parties had concluded their deal, but only whether they had entered into a binding preliminary commitment which required further steps. Here, the reservation of Board approval and the expressed "contingen[cy] upon the preparation, execution and delivery of documents" did not override and nullify the acknowledgement that a "binding agreement" had been made on the stated terms; those reservations merely recognized that various issues and documentation remained

open which also would require negotiation and approval. If full consideration of the circumstances and the contract language indicates that there was a mutual intent to be bound to a preliminary commitment, the presence of such reservations does not free a party to walk away from its deal merely because it later decides that the deal is not in its interest.

*The Context of the Negotiations*

These conclusions are further reinforced by the particular facts of the negotiation. As Smith's proposal letter of August 20 advised Teachers, Tribune wanted "to have a firm commitment from a lender by September 15, 1982." If such a "firm commitment" meant nothing more than Tribune now contends it does, such a commitment would have been of little value, as the lender would have remained free to abandon the loan if it decided at anytime that the transaction did not suit its purposes, whether because of changed interest rates or for any reason: Tribune wanted a firm commitment because it felt it needed to be sure the transaction would be concluded by the end of the year.

This same thinking governed Tribune's conduct a month later when it received the Teachers' commitment letter. Tribune's lawyers, recognizing that the form of agreement committed Tribune to a "binding" obligation, warned about the consequences of signing it. Tribune, however, wanted Teachers' binding commitment to make the loan. Tribune had been turned down by the five other lenders it considered eligible, and it did not want to risk losing Teachers' commitment. Accordingly, Smith refrained from raising any question about the "binding agreement" language. If he intended by adding the reservation of approval of Tribune's Board of Directors to change the deal fundamentally by freeing Tribune from binding obligations without Teachers noticing the change, he did not accomplish this. Tribune remained committed, as Teachers did. That is to say each was obligated to seek in good faith to conclude a final agreement within the terms specified in the commitment letter, supplemented by such repre-

sentations, warranties and other conditions as are customary in such transactions. Teachers would not have been free to walk away from the loan by reason of a subsequent decision that the transaction was not in Teachers' interest. Nor could Tribune.

Tribune further contends that, given the uncertainties implicit in the three-cornered deal, neither party could have considered the loan commitment as binding. The agreed terms required Tribune to pay a premium over the prevailing interest rates for the privilege of its option to put the mortgage to Teachers. If Tribune had failed to conclude its deal with LaSalle for the sale of the Building, there would have been no purchase money mortgage and no reason for paying an interest premium.

The argument is not frivolous, but nor is it compelling. If Tribune had failed to sell the News Building and Teachers had nonetheless sought to compel it to take down the loan, Tribune might have succeeded in arguing that the sale of the Building was a mutually agreed implicit condition of the enforceability of the loan agreement. Tribune's argument in those circumstances would have been supported by the references in the commitment letter to the purchase money mortgage resulting from the Building sale.

But, however that dispute would have been resolved had it arisen, it does not compel the conclusion that there was no binding obligation. The Building sale did not fall through. It was concluded on the anticipated terms.[11] If the sale of the Building was an implicit condition of the borrowing, that condition was fulfilled.

*Open Terms*

Tribune contends that the commitment letter agreement included so many open terms that it could not be deemed a binding contract.[12] It argues also that the numerous open terms indicate a lack of intention on either side to be bound.[13] Neither contention is convincing. Tribune does cite reputable authority to the effect that, notwithstanding language of binding agreement, if a contract fails to include agreement on basic terms of prime importance, it can be considered a nullity.[14] This principle, however, has no application to the present facts. The two page term sheet attached to the commitment letter covered the important economic terms of a loan. The fact that countless pages of relatively conventional minor clauses remained to be negotiated does not render the agreement unenforceable.[15]

The contention is superficially appealing with respect to the mortgage. The commitment letter, although referring to Tribune's optional right to put a mortgage to Teachers in satisfaction of its obligations, did not specify any of the terms of such a mortgage. Absence of agreement on so important a specification as the basic terms of the mortgage would render this agreement illusory. There was, however, no absence of agreement on the basic terms of the mortgage. The references in the commitment letter to the mortgage were understood by both parties as references to the mortgage term sheet that Tribune had furnished to Teachers in its Offering Circular. [The commitment letter stated that the mortgage to be tendered by Tribune "shall preserve the economics proposed for the present Mortgagee (Tribune Compa-

**11.** The purchase money mortgage delivered by LaSalle was substantially in the terms outlined in Tribune's initial offering circular, which terms were incorporated by reference in the commitment letter agreement with Teachers. To the extent there was any change between the term sheet and the final mortgage, such change had no relevance to Tribune's abandonment of its loan commitment.

**12.** *See Joseph Martin, Jr., Delicatessen Inc. v. Schumacher,* 52 N.Y.2d 105, 436 N.Y.S.2d 247, 417 N.E.2d 541 (1981); *Kleinschmidt Division of*

*SCM Corp. v. Futuronics Corp.,* 41 N.Y.2d 972, 395 N.Y.S.2d 151, 152, 363 N.E.2d 701 (1977).

**13.** *See Winston,* 777 F.2d at 80, 82–83; *R.G. Group,* 751 F.2d at 76–77.

**14.** *See supra* notes 12 and 13.

**15.** *See Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 453 (2d Cir.1977); *V'Soske v. Barwick,* 404 F.2d 495, 500 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969).

ny)."] That two-page term sheet described the important economic terms of the proposed LaSalle purchase money mortgage. Notwithstanding its silence as to countless pages of secondary conventional mortgage clauses which remained to be negotiated, it sufficiently specified the important terms to make the commitment letter agreement meaningful and enforceable.[16]

Nor did the existence of open secondary terms compel the conclusion that the parties did not intend to be bound. In support of this argument, Tribune cites the implication of the Court of Appeals in *R.G. Group*, 751 F.2d at 76–77 and *Winston*, 777 F.2d at 80, 82, that the existence of any single open term requires the conclusion that a binding contract had not yet been reached. This takes the Court's observation out of context and distorts its meaning. If the issue is whether the parties have reached final agreement requiring only formal memorialization, the recognized existence of open terms may be a strong indication that they have not. If, on the other hand, as here, the question is whether a preliminary expression of commitment was intended to bind the parties to negotiate the open terms in good faith, the mere fact of the existence of open terms is, of course, far less persuasive. Although the existence of open terms may always be a factor that suggests intention not to be bound, it is by no means conclusive. Where the parties have manifested intention to make a binding agreement, the mere fact of open terms will not permit them to disavow it.

*Partial Performance*

The factor of partial performance slightly favors Teachers. The evidence shows that for Teachers, its "commitment" to lend involved a budgeting of the funds, albeit somewhat informal. Teachers was in the business of lending its funds. The amount it had available for placement in long-term loans was finite, if large. In its loan budgeting process, Teachers would in-

formally allocate funds which had been so committed. Such allocation reduced the net amount considered available for commitments to new loans. In fact, Teachers advised Tribune that it had only $25 million remaining available to be advanced in 1982 and that the rest would be advanced in 1983.

Tribune argues that because there was no formal segregation, it was of no significance. This misses the point. However informally it was done, the allocation of the loan commitment effectively reserved the funds for the Tribune loan. It reduced the amount of Teachers' funds that it would consider available to competing borrowers. It meant that Teachers would forego opportunities to procure commitments from other borrowers when its own commitments exhausted its available funds.

In urgently seeking Teachers' "firm commitment" by September 15, Tribune well understood that the commitment would involve a partial performance on Teachers' part. By virtue of the commitment given in September, Tribune was assured that when the time came in December for concluding final documents and drawdown, it would not be told that Teachers had nothing left to lend. Tribune was negotiating to reserve those funds. Teachers acceded and issued the commitment. That constituted a partial performance.

A party's partial performance does not necessarily indicate a belief that the other side is bound. A party may make some partial performance merely to further the likelihood of consummation of a transaction it considers advantageous. This factor was not the subject of highly focused evidence. I have not attached great importance to it and mention it primarily because it is listed among the factors suggested by the Court of Appeals in *R.G. Group* and *Winston*. I conclude, however, that this factor favors the conclusion that both sides considered the commitment binding.

---

**16.** On the earlier motion for judgment on the pleadings, the absence of specification of terms for the mortgage led this court to express doubt whether the Teachers-Tribune commitment letter could have been intended as binding. At the time, however, having received none of the evidence, I was not aware that a mortgage term sheet had been circulated between the parties and was implicitly incorporated in the commitment letter agreement.

*The Customary Form for Such Transactions*

The fourth factor mentioned in *R.G. Group*, and *Winston*, is "whether the agreement at issue is the type of contract that is usually committed to writing." 777 F.2d at 80. *See also* 751 F.2d at 77. Of course, the agreement here, unlike those cases, was in writing, but that does not dispose of the issue. To give this factor a broader application, it would better be put in terms of whether in the relevant business community, it is customary to accord binding force to the type of informal or preliminary agreement at issue. The evidence on that question tends to favor Teachers.

Of course it is true, as Tribune argues, that $80 million loans involving mortgages are generally not concluded by means of a four-page letter. But that is not the issue. The question is rather whether the customary practices of the relevant financial community include according such binding force as Teachers here advocates to such preliminary commitment agreements. Teachers' expert evidence showed that it is within the recognized practices of the financial community to accept that preliminary commitments can be binding. Not all preliminary commitments are binding. Some are not. Some are binding on only one side: Where, for example, the borrower pays a commitment fee for the purpose of binding the lender, the agreement may be in the nature of an option to the borrower to decide by a specified date whether to go ahead with the transaction. In such cases the seller has been paid for its one-sided commitment. Some such preliminary agreements are properly seen as merely letters of intent which leave both sides free to abandon the transaction. The point is that the practices of the marketplace are not rigid or uniform. They encompass a considerable variety of transactions negotiated to suit the needs of the parties, including mutually binding preliminary commitments. Each transaction must be examined carefully to determine its characteristics.

Tribune has failed to show to the court's satisfaction that such binding commitments are outside the usages of the marketplace.

*Action by Tribune's Board of Directors*

The parties disagree as to whether the Teachers' loan was or was not approved by Tribune's Board of Directors. Tribune contends that the resolutions adopted by its Board on October 28th did not involve any approval whatsoever, but merely a delegation of responsibility to the Finance Committee to approve or disapprove the transaction. Teachers contends that the action of the Board did approve the loan in concept, while delegating to the Finance Committee the right and authority to pass on the particular loan documents. Teachers contends that its interpretation is reinforced by Smith's statement to Driver, when she inquired in late November, that the Board had given "general approval" to the transaction at the October 28 meeting (a statement Smith denies having made).

I need not rule on whether the resolutions adopted by the Board of Directors did or did not constitute approval of the transaction, because nothing turns on this. As noted above, although Tribune had reserved the right of approval of the final transaction to its Board of Directors, this did not mean Tribune could defeat its obligations under the binding agreement of commitment merely by having its Board do nothing. The commitment agreement called for conclusion of the transaction and a $25 million first drawdown before the end of the year. Even if I were to accept Tribune's contention that its Board took no action other than to delegate responsibility to the Finance Committee, that would not justify Tribune's backing out of its binding agreement to negotiate in good faith to reach a complete final contract.

Tribune's argument would construe the commitment letter agreement either as a free option to Tribune to decide over the next three months whether to hold Teachers to its commitment to make the loan, or alternatively as a nonbinding statement of mutual intention. Neither is consistent with either the written agreement or the conduct of the parties. Tribune had re-

quested the "firm commitment" of Teachers to make the loan. Teachers' firm commitment was not given for free but in exchange for Tribune's similarly binding commitment. The reservations as to preparation and execution of documents and as to the satisfaction of Teachers' counsel and Tribune's Board permitted each side to negotiate the implementation of the agreement and to require the inclusion of customary terms in a form which it deemed necessary or appropriate to its protection. But those reservations did not authorize either side to escape its obligation simply by declining to negotiate or to give approval.

In any event, I conclude that Tribune's Board did give approval within the meaning of the agreement. The Minutes reflect that the proper officers were expressly authorized to arrange for the borrowing at a maximum interest rate of 15.25%, "with all of the actual terms and conditions to be subject to the prior approval by resolution of the Finance Committee...." The Resolution went on to say that the "authority granted by this resolution shall expire if not utilized prior to April 30, 1983." (DX 19.) This express authorization to "the proper officers ... to arrange for" the borrowing (which would expire if not acted on by April 30, 1983), surely went beyond a mere delegation to the Finance Committee of the Board's responsibility to approve or disapprove. The fact that the authorization was "subject to" Finance Committee approval recognized rather that there were terms and documents that remained to be negotiated, calling for Board level approval. It did not mean that the Board had done nothing but delegate. On consideration of the minutes and resolutions, as well as the testimony of Tribune officers and directors who were present at the meeting, I find, as Smith later told Driver, that the Board gave "general approval" to the transaction.

Tribune's October 6 letter reserving approval to Tribune's Board did not specify any particular form of Board approval, nor did it require that approval be of the final loan documents. Indeed, it distinguished between the requirements of "*approval* by the Company's Board of Directors" and "the preparation and execution of legal documentation *satisfactory to the Company*." The general approval given was sufficient under the contract.

### Tribune's Right to Condition the Loan on Offset Accounting

Tribune contends that its right to carry the loan off-balance-sheet by offset accounting was always deemed an essential condition of the deal. It points out that the Offering Circular which it delivered to Teachers, and the Price Waterhouse background memoranda, which also were delivered to Teachers during the early due diligence and discussion phase, all underlined offset accounting as an important Tribune concern. Nor does Teachers deny that in the early discussions, Smith spoke of Tribune's accounting and tax objectives. The witnesses disagree along predictable lines as to whether Driver told Smith that Teachers would not take the risk of Tribune's accounting treatment. The conflict need not be resolved. For regardless whether Driver orally refused to have Teachers assume the risk of Tribune's right to satisfactory accounting, the signed agreement did not provide for any such condition. The written agreement between the parties contains no basis whatever for the proposition that Tribune's obligation was conditioned on satisfactory assurance that it could report the loan off balance sheet. The fact that Tribune considered this significant is not disputed, but it is not determinative.

Both parties were aware of Tribune's objectives as to both the tax and accounting for the proposed deal. Tribune could, of course, have demanded as a condition of its commitment that it receive satisfactory assurances (in the form of opinion letters of counsel and auditors, or otherwise) as to both deferred taxation and offset accounting. It could have offered to pay a fee for Teachers' commitment on terms that would have left Tribune free to proceed with the loan or not, at its option. Alternatively, it could have negotiated for the option to prepay if the Internal Revenue Service or the SEC disallowed the desired tax or accounting consequences. The problem was

that in September of 1982, Tribune believed that it needed an immediate "firm commitment" from Teachers to be sure of its ability to conclude the transaction as planned within 1982. Had Tribune made such demands, Teachers might well have turned down Tribune's proposal (as the five other institutions had done). Indeed, Tribune was so sensitive to its need for Teachers' firm commitment that when its counsel warned of the consequences of signing the commitment letter with its "binding agreement" language, Tribune disregarded this advice so as not to lose the lender's commitment. Neither the language of the agreement, nor the negotiations of the parties give any support to the contention that offset accounting was a condition of the agreement.

There was perhaps an additional reason why Tribune did not negotiate for offset accounting as a condition of the deal, being that in September and early October it did not have the doubts that it later developed as to the availability of offset accounting. It had received a prior opinion of Price Waterhouse to the effect that the unconditional put would make offset accounting appropriate. Only after the FASB's mid-October exposure draft did Price Waterhouse begin to emphasize doubts about offset accounting and about the position the SEC might take in the event Tribune offered public securities under an SEC registration statement.

Whether the reason was that Tribune was afraid to lose Teachers prompt firm commitment, or that Tribune had not yet worried, as it later did, about the availability of its accounting objective, or simply that Tribune was willing to take the risk to secure this important deal, the fact is that Tribune did not negotiate for and did not obtain its right to offset accounting as a condition of its bargain.

By December of 1982 Tribune faced a completely different set of factors. Interest rates had declined very substantially. The loan agreement that it negotiated with Teachers was no longer to its benefit since it could now borrow money at substantially cheaper cost. Price Waterhouse's newly expressed doubts about the availability of offset accounting gave it further reason to question whether the deal it had made was a good one. With the benefit of two months' hindsight, Tribune most likely would not have entered into the commitment agreement it made in early October. That was, however, the agreement it made.

*Conditions Precedent to Enforcement*

Tribune contends that even if the commitment letter constituted a valid, enforceable contract, there were conditions precedent to its enforcement that were never satisfied. Teachers' commitment letter stated that the authorization of the loan was "contingent upon the preparation, execution and delivery of" final contract documents; Tribune's response, likewise, stated that "our acceptance and agreement is subject to ... the preparation and execution of legal documentation satisfactory to the Company." Tribune contends that since final contract documents were never prepared, the conditions precedent to the enforceability of the agreement were never satisfied and, accordingly, Tribune cannot be charged with breach. This argument misconceives the meaning of these clauses. The preliminary agreement envisions and requires further and final contract documents without which the loan will not be made; if, through no fault on either party, no final contract were reached, either because the parties in good faith failed to agree on the open secondary terms, or because, as often happens in business, the parties simply lost interest in the transaction and by mutual tacit consent abandoned it without having reached final contract documents, no enforceable rights would survive based on the preliminary commitment. This does not mean that the language of reservation authorized one party to kill the deal simply by refusing to negotiate or to sign the contract documents.[17] Such an interpretation would render lan-

---

17. *See Butler,* 626 F.Supp. 1229; *Mid-Continental Telephone Corp. v. Home Telephone Co.,* 319 F.Supp. 1176 (N.D.Miss.1970).

guage like "binding agreement" and "firm commitment" meaningless.

Tribune's point would be well taken if the negotiations had aborted over inability to reach agreement on the terms of the purchase money mortgage or the put. Indeed, if they had aborted because Teachers had insisted on imposing conditions on the exercise of the put that were incompatible with the initial agreement, Tribune might properly have charged Teachers with breach of the commitment letter agreement.

What in fact happened was the other way around. Tribune broke off contract negotiations by insisting on a condition (satisfactory accounting) that was not within the scope of the agreement. Although Tribune's refusal to go ahead with the contract may well have been motivated in part by doubts as to the availability of offset accounting, I find that that decline in interest rates also substantially influenced Tribune's decision.

Of course it is true that numerous issues remained open at this time. The basic loan agreement was in draft form, recently circulated by Teachers, without any negotiations having taken place over its form and minor terms. Although I find (as a matter of disputed fact) that Teachers had expressed its agreement to a put on terms that were acceptable to Tribune, it is less clear that Teachers had ever stated its acceptance of the form of mortgage that Tribune had concluded with LaSalle. (Teacher's counsel Tencza of the Debevoise firm had recently sent Tribune a letter specifying 35 problematic points in the LaSalle purchase money mortgage.) But the existence of those open points is of no consequence because they did not break the deal. Teachers offered in mid-December to sit down with Tribune and resolve all open issues so that the first drawdown could be made before the end of the year as contemplated in the commitment letter; Tribune declined stating that such a meeting would be of no value unless Teachers was prepared to agree that Tribune's satisfaction as to its accounting would be a

condition of its obligation to draw down the loans.

Whatever Teachers' past posture had been as to the mortgage put and terms, there is every reason to believe that it would have acceded to Tribune's demands so long as they were within the terms of the commitment agreement. Given the fact that interest rates had dropped precipitously from the time of the commitment letter, it would have been bad business judgment for Teachers to lose the deal by refusing to agree on points of minor importance. Driver's testimony that Teachers was prepared to agree to Tribune's terms on the purchase money mortgage and the put is entirely credible. But the issue does not depend on a finding as to the likelihood of Teachers acceding to Tribune's demands on those open issues. The point is simply that Teachers, in conformity with its contract obligations, was asking Tribune to sit down and negotiate in good faith towards agreement on the open points, while Tribune refused to negotiate unless Teachers agreed to add a condition that was outside the scope of the bargain. The existence of open points and the failure of the parties to satisfy the condition of execution of final documentation is, therefore, chargeable to Tribune. It cannot rely on those circumstances to escape its contract obligation.

*The Payment–of–Expenses Clause*

Tribune also argues that the provision of the commitment letter for Tribune's payment of Teachers' expenses "whether or not this transaction is consummated" (DX 13) evidences the parties' awareness that the transaction might not be concluded, hence that they did not consider the agreement binding. The argument does not follow. The parties certainly contemplated that the loan might not be concluded. They might, for example, have failed after good faith negotiation to reach final agreement on open terms, or might eventually have decided mutually that the deal was not practical. In such case Tribune would have been required to pay Teachers' expenses and nothing more. But this provision does not contradict the express acknowledgement that the agreement was

binding. The recognition of the possibility that the loan might not be concluded did not signify that either side was free to walk away.

*Unaccepted Counteroffer/Untimely Acceptance*

Tribune makes two insubstantial further arguments seeking to refute the contention that a contract of commitment was reached:

First it argues that because Teachers' letter specified that its offer would be outstanding only until October 4 and Tribune did not accept until October 6, the acceptance was ineffectual. There is no merit to this argument. Tribune had requested Teachers to hold its commitment offer open and Teachers had agreed to do so. (Driver Aff. as to liability, ¶ 35.)

Second, Tribune argues that by reason of its amendment of terms in its letter of October 6, this letter could not constitute an acceptance of Teachers prior offer, but was rather a counteroffer which was never accepted. This contention is based on incorrect assumption as to the facts. Teachers expressly agreed to Tribune's changes. (Driver Aff. as to liability, ¶¶ 32–38.)

*The Applicability of the* Butler *Precedent*

The parties dispute the pertinence of Judge Weinfeld's recent ruling in *Teachers Insurance and Annuity Assoc. v. Butler*, 626 F.Supp. 1229 (S.D.N.Y.1986). In *Butler*, the same lender had entered into a commitment letter agreement with a real estate developer within a few days of the commitment letter in this action. It provided for a 35–year loan at a yield of 14.25%, with a "lock-in" provision forbidding prepayment for a specified number of years.

Although the commitment letter was in many ways far more elaborate and detailed than this one, it was, in several respects, similar in that it required the further preparation and execution of contract documents, and reserved approval of counsel as to such documents.

The negotiations between lender and borrower over open terms and documents proceeded during the same period of steep decline in interest rates. In the course of the negotiations, the lender proffered a Default Prepayment Fee clause, which would have attached a substantial penalty to prepayment occasioned by default. The borrower rejected this clause, made no counteroffer and refused to negotiate, or to proceed with the deal. Thereupon the lender brought suit, as here, to recover the benefits of its commitment letter agreement.

Although such a default prepayment fee was not specified in the commitment letter, Judge Weinfeld found it was generally within the intended scope of the specified "lock-in" provision, for without such a clause, the borrower might accomplish by default exactly what it was prohibited from doing by prepayment. Recognizing that the commitment letter did not specify any particular way of dealing with the problem and that the borrower might properly have objected to the particular penalty clause proposed by the lender, Judge Weinfeld nonetheless concluded that the borrower's refusal to counteroffer or negotiate the issue breached its obligations to negotiate in good faith. Judge Weinfeld further found that the breach was primarily attributable to the intervening decline in interest rates. Judgment was awarded for the plaintiff.

The two cases are governed by the same principles, although by somewhat different analysis. In each case, the commitment letter constituted a binding enforceable agreement that obligated both parties to negotiate in good faith to resolve the open terms and documents. In each case, the borrower breached its obligations by refusing to negotiate toward resolution of such open issues. The breaches were of slightly different form. While in *Butler* the borrower breached by refusing to negotiate a clause that was within the scope of the agreed terms, here the borrower breached by refusing to negotiate unless the lender agreed to modify the deal by accepting a new condition. The differences, including the greater complication of this deal, the greater detail of the *Butler* letter, the absence in *Butler* of the clause requiring approval of the borrower's Di-

rectors, and the particular forms of the borrowers' refusals to negotiate, are not controlling. In this case, as in *Butler*, the borrower undertook a binding commitment to negotiate open terms in good faith and breached that commitment.

\* \* \*

Judgment is granted to the plaintiff.

SO ORDERED.