Charles R. McNAMARA, Plaintiff,

v.

TOURNEAU, INC., Defendant.

No. 05 CIV. 7804(DC).

United States District Court,
S.D. New York.

Dec. 5, 2006.

Charles R. McNamara, Queens Village, NY, Plaintiff Pro Se.

Proskauer Rose LLP, By Steven D. Hurd, Esq., New York, NY, for Defendant.

### *MEMORANDUM DECISION*

CHIN, District Judge.

In this employment case, the parties participated in the Court's *pro se* mediation program. At the conclusion of the mediation, the parties reached a settlement and signed a stipulation memorializing the principal terms of the agreement. *Pro se* plaintiff Charles McNamara, who was assigned *pro bono* counsel for the mediation, then changed his mind and refused to sign a formal agreement, insisting on going forward with the lawsuit. Defen-

dant Tourneau, Inc. now moves to enforce the settlement, contending that the parties entered into a binding contract. Although I conclude that the parties agreed to be bound, the motion is denied, for the contract permitted McNamara to revoke, and he did so in a timely manner.

## BACKGROUND

### A. The Facts

For purposes of this motion, I assume that the facts alleged in the complaint ("Compl.") and the charge of discrimination ("Charge") attached thereto are true.

In December 2003, Tourneau, a watch retailer, hired McNamara as a sales associate at its 57th Street location in Manhattan. (Charge, Attach.¶ 2). The position required him to spend a substantial amount of time on his feet. (*Id.* ¶ 11).

On June 3, 2004, McNamara fell on his way to work and injured his back and leg. (*Id.* ¶ 5). McNamara informed his supervisors at Tourneau of his injury and his need to miss work. (*Id.* ¶ 7). On June 15, 2004, McNamara returned to work. (*Id.* ¶ 13). The physical demands of the job, however, exacerbated his injury. (*Id.*). McNamara called in sick due to pain in his back and leg and missed several more days of work. (*Id.* ¶¶ 14–16).

On June 28, 2004, McNamara returned to work but left early because of his pain. (*Id.* ¶ 22). Thereafter, his supervisors began to act in a hostile manner toward him because he needed time off to attend physical therapy. (*Id.* ¶¶ 20–21). On July 2, 2004, McNamara informed Tourneau that he had scheduled a meeting with the New York City Human Rights Commission (the

"Commission") for July 20, 2004, and that he planned to file a discrimination complaint against Tourneau with the Commission. (*Id.* ¶ 25). On July 20, 2004, Tourneau fired McNamara. (*Id.* ¶¶ 33–34).

### B. Procedural History

#### 1. Administrative Charges

McNamara appeared for an intake interview on July 20, 2004, at the Commission. (Pl.'s 4/17/06 Let., Ex. III). The Commission refused to accept the complaint because the Commission determined that McNamara "[f]ailed to state a claim." (*Id.*). McNamara then filed a verified complaint with the New York State Division of Human Rights on or about August 10, 2004. (*Id.* Ex. VI).

On April 25, 2005, McNamara filed a charge with the Equal Employment Opportunity Commission (the "EEOC") alleging that Tourneau (1) discriminated against him based on his disability, and (2) committed unlawful retaliation against him. (Charge at 1). The EEOC did not make a probable cause finding but issued McNamara a "right to sue" letter so that he could pursue the matter in federal court. (Compl. ¶ 12 & Attach.).

#### 2. This Lawsuit

On September 6, 2005, McNamara commenced this action alleging that Tourneau had violated the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12112–12117. (Compl. at 1).[1] McNamara did not allege a violation of the Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 621. (*Id.*).

---

**1.** On the *pro se* complaint form, McNamara also indicated that Tourneau violated Title VII of the Civil Rights Act of 1964. Title VII protects against discrimination based on race, color, gender, religion, and national origin. *See* 42 U.S.C. §§ 2000e–2000e–17. No part of McNamara's previous administrative charges, however, alleged any discrimination based on Title VII, and McNamara has never alleged that Tourneau discriminated based on race, color, gender, religion, or national origin. Therefore, the Title VII claim is dismissed.

On November 18, 2005, McNamara, acting *pro se*, and Tourneau's counsel attended a pre-trial conference before the Court. I discussed settlement with the parties briefly, and McNamara advised that he would be willing to settle for $25,000. (Def. 4/19/06 Let., at 1).[2] Because it appeared that McNamara's expectations were reasonable, I thought the case would be a good candidate for the Court's *Pro Se* Employment Discrimination Mediation Program, pursuant to which *pro se* plaintiffs in employment discrimination cases are assigned *pro bono* counsel solely for purposes of mediation. With counsel assigned for these purposes, the litigants become eligible to participate in the Court's general mediation program, which is not available to *pro se* litigants. The *pro bono* lawyers are able to provide the litigants with much-needed legal advice, and if the mediation fails, the lawyers are not obligated to remain in the case.

Both McNamara and Tourneau agreed to participate in the program, and eventually both sides signed a form consenting to mediation. On January 19, 2006, this Court formally ordered the case eligible for mediation.

### 3. *The Mediation*

On January 25, 2006, the Court's *Pro Se* Office assigned attorney Marc Lepelstat to assist McNamara in the mediation. On March 21, 2006, both parties attended the mediation with their respective counsel. During the mediation session, the mediator—an experienced attorney who was also participating on a *pro bono* basis—spoke to each party separately. (*See* Pl.'s 4/17/06 Let., at 1; Def.'s 4/19/06 Let., at 1). One

of Tourneau's attorneys, Steven Hurd (who was then with Jackson Lewis LLP and is now with Proskauer Rose LLP), spoke about the November 18, 2005, pre-trial conference. When the mediator later spoke separately to McNamara, the mediator said something to lead McNamara to conclude that the mediator mistakenly believed that Hurd had attended the conference. McNamara informed the mediator that Hurd had not been present at the conference. (Pl.'s 4/17/06 Let., at 2; Def.'s 4/19/06 Let., at 1–2).[3]

At the end of the mediation session on March 21, 2006, the parties, with the assistance of counsel, reached an agreement, which was memorialized in a stipulation (the "Stipulation"). The Stipulation contained six principal terms, as follows:

1. Settlement Amount is $20,000, subject to normal withholding, payable upon entry of dismissal order.
2. Plaintiff will provide General Release and formal dismissal.
3. Both sides to keep confidential.
4. Mutual non-disparagement.
5. Neutral reference. Title, responsibility and dates of employment.
6. Standard 21 day language.

(Def.'s 4/19/06 Let., Ex. A). Both McNamara and Tourneau's counsel signed and initialed the Stipulation the same day. (*Id.*). The Stipulation provided that Tourneau's counsel would draft "APPROPRIATE PAPERS" within five business days. (*Id.*). Both the Stipulation and a separate document, signed by McNamara, his lawyer, and Tourneau's counsel, included language that provided: "FOLLOWING MEDIATION THE PARTIES HAVE

2. Tourneau's April 19, 2006, letter is misdated April 19, 2005. It will be cited as "4/19/06 Let.".

3. Hurd advises that he never told the mediator that he attended the pre-trial conference.

(Def.'s 4/19/06 Let., at 2). Hurd notes that even if his statements to the mediator implied that he had been present, Hurd later clarified his participation to the mediator, and thus McNamara suffered no injury. (*Id.*). The Court accepts Hurd's representations.

REACHED A SETTLEMENT AGREE-
MENT AND WILL FILE APPROPRI-
ATE PAPERS." (*Id.*).

### 4. *Post–Mediation*

On March 27, 2006, Tourneau's counsel sent McNamara a copy of a proposed formal settlement agreement (the "Proposed Agreement") and an order of dismissal. (Pl.'s 4/17/06 Let., Ex. VII). The Proposed Agreement, in addition to releasing Tourneau from claims relating to the ADA, also released Tourneau from numerous federal and state employment claims that McNamara had not alleged, including, *inter alia*, claims under the ADEA. (*Id.* Ex. VIII). This was consistent with the Stipulation, which provided for McNamara to sign a general release. The second-to-last page of the Proposed Agreement, in bold, capital letters, stated, in part, that: "PLAINTIFF HEREBY CONFIRMS THAT HE HAS BEEN AFFORDED TWENTY–ONE (21) DAYS TO CONSIDER THIS NEGOTIATED SETTLEMENT AGREEMENT AND GENERAL RELEASE." It also provided that "PLAINTIFF ALSO CONFIRMS THAT HE HAS SEVEN (7) DAYS FROM THE DATE HE SIGNS THIS CONFIDENTIAL NEGOTIATED SETTLEMENT AGREEMENT AND GENERAL RELEASE TO REVOKE THIS RELEASE." (*Id.*).

On April 11, 2006, in light of the apparent settlement, the Court entered a thirty-day order dismissing the case, subject to reinstatement within thirty days in the event the settlement was not finalized.

On April 17, 2006, McNamara wrote the Court expressing his concern that Tourneau's attorney had misrepresented his presence at the November 18, 2005, pre-trial conference to the mediator. (Pl.'s 4/17/06 Let., at 1–2). McNamara suggested that this alleged misrepresentation tainted the credibility of the entire mediation process. (*Id.* at 2). McNamara then attempted to re-plead the merits of his case to this Court. (*Id.* at 4–6).

On April 28, 2006, the Court held a conference with McNamara and Tourneau's counsel. At the conference, McNamara reiterated his refusal to sign the Proposed Agreement.[4] On May 1, 2006, the Court issued an order providing that McNamara's April 17, 2006, letter would be treated as an application to reinstate the action.

On May 11, 2006, Tourneau filed a motion to enforce the Stipulation. Although the Court ordered McNamara to submit his opposition to the motion by May 26, 2006, McNamara did not respond until July 12, 2006, when he did so by letter. McNamara stated that he believed the Stipulation's reference to "Standard 21 day language" and the Proposed Agreement's reference to a twenty-one day consideration period meant that he would have twenty-one days to review the Proposed Agreement and "to decide whether or not to sign the settlement." (Pl. 7/12/06 Let., at 1).

### DISCUSSION

### A. *Choice of Law*

As a threshold matter, I must consider what substantive law applies in this case,

---

4. After the conference, McNamara moved for my recusal, accusing me of improper conduct. In a May 26, 2006, Order, I denied the motion. On November 3, 2006, McNamara again requested my recusal, and I denied the renewed request on November 6, 2006. McNamara's recusal motions continue his pattern of unjustly casting aspersions on others. He accused Tourneau's attorney of lying to the mediator. He also accused the intake employee at the Commission, who declined to accept his complaint, of being "incredibly prejudiced, discriminatory, offensive, [and] unprofessional." (Pl.'s 4/17/06 Let., Ex. III).

where a dispute has arisen over a settlement agreement governing a claim based on federal law.[5]

■ The Second Circuit has never explicitly held whether state contracts law, as opposed to federal common law, applies to agreements settling federal claims. *See Ciaramella v. Reader's Digest Ass'n*, 131 F.3d 320, 322 (2d Cir.1997) (declining to decide between federal and state law because there was "no material difference" between the respective standards). In practice, however, both the Second Circuit and its district courts have applied state law to settlements of federal claims, in part because there appear to be no material differences. *See, e.g., Torres v. Walker*, 356 F.3d 238, 245–46 (2d Cir.2004) (applying New York law to review § 1983 stipulation agreement); *Hughes v. Lillian Goldman Family, LLC*, 153 F.Supp.2d 435, 444–45 (S.D.N.Y.2001) (applying New York law to review of Fair Housing Act release). *But see Kilcullen v. Metro N. Commuter R.R. Co.*, 95–CV–6331 (CSH), 1998 WL 647171, 1998 U.S. Dist. LEXIS 14765, at *13 (S.D.N.Y. Sept. 22, 1998) (applying federal common law to agreement settling claims arising under federal statutes). Likewise, I will apply New York contracts law here, as the Stipulation was negotiated and executed in New York and there appear to be no material differences. *See Rosenberg v. Inner City Broad. Corp.*, 99–CV–9579 (AKH), 2001 WL 995349, 2001 U.S. Dist. LEXIS 13192, at *6 (S.D.N.Y. Aug. 30, 2001) (applying New York law to settlement of federal claim because relevant activity, "including the communications leading to the settlement agreement," occurred in New York).

## B. *The Merits*

### 1. *Applicable Law*

#### a. *Contracts Law*

■ It is well established that "[s]ettlement agreements are contracts and must therefore be construed according to general principles of contract law." *Collins v. Harrison–Bode*, 303 F.3d 429, 433 (2d Cir.2002) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir.1999)). In New York, a contract is valid if there is an offer and acceptance, consideration, mutual assent, and an intent to be bound. *See Register.com v. Verio*, 356 F.3d 393, 427 (2d Cir.2004).

■ Sometimes, parties sign an informal document, with the understanding that a more formal contract will follow. Courts have recognized two types of informal agreements that bind parties in different ways. *See Adjustrite Sys. v. GAB Bus. Servs.*, 145 F.3d 543, 547–48 (2d Cir.1998) (applying New York law); *see also Teachers Ins. & Annuity Assoc. v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987). First, there are preliminary agreements where parties agree on certain major terms but contemplate further negotiations over other terms. *Id.* These preliminary contracts—called "binding preliminary commitments"—are binding only in the sense that the parties "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement." *Id.* Second, there are preliminary agreements where parties agree on all major negotiable terms of the contract and intend to be bound, but wish to memorialize their agreement in a formal document. *Id.* This type of preliminary agreement is fully binding on both parties "despite the antici-

---

**5.** This Court has jurisdiction over this dispute, even though the case has been dismissed, because the Court issued an order allowing for reinstatement within thirty days, and McNamara requested reinstatement within the thirty-day period.

pation of further formalities," *i.e.,* even if the parties do not execute a more formal contract. *Id.* In some cases, an informal stipulation of settlement may be such a fully binding agreement. *See Janneh v. GAF Corp.,* 887 F.2d 432, 436 (2d Cir.1989) (finding plaintiff intended to be bound when he signed statement agreeing to settle Title VII claim for a particular sum), *rev'd on other grounds by Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994); *Little v. Greyhound Lines,* No. 04–CV–6735 (RCC), 2005 WL 2429437, 2005 U.S. Dist. LEXIS 22247, at *4 (S.D.N.Y. Sept. 30, 2005) (finding plaintiff who signed stipulation of settlement intended to be bound).[6]

 Even if parties intend to be bound, it necessarily follows that the contract is unenforceable if there is no meeting of the minds—the parties have a different understanding of the material terms of their agreement. *See Int'l Paper Co. v. Suwyn,* 966 F.Supp. 246, 254 (S.D.N.Y. 1997); *Brands v. Urban,* 182 A.D.2d 287, 587 N.Y.S.2d 698, 700 (2d Dep't 1992). To determine if the parties agreed on a contract's material terms, New York courts must first look to the written contract to assess whether it contains clear and unequivocal language or whether the language is ambiguous such that the parties could reasonably interpret it in different ways. *See Brands,* 587 N.Y.S.2d at 700.

If a court finds ambiguity in the words of the contract, the court then may consider extrinsic evidence to determine the intent of the parties. *See Teitelbaum Holdings, Ltd. v. Gold,* 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 396 N.E.2d 1029 (1979); *Wankel v. Spodek,* 1 A.D.3d 260, 767 N.Y.S.2d 429, 430 (1st Dep't 2003).

 In New York, a contractual term is ambiguous if the meaning is not "definite or precise." *Computer Assocs. Int'l, Inc. v. U.S. Balloon Mfg. Co.,* 10 A.D.3d 699, 699, 782 N.Y.S.2d 117 (2d Dep't 2004) (quoting *Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)). The test for ambiguity is whether an objective reading of a term could produce more than one reasonable meaning. *See Collins v. Harrison–Bode,* 303 F.3d 429, 433 (2d Cir.2002). A party, however, may not create ambiguity in otherwise clear language simply by urging a different interpretation. *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 889 (2d Cir.1990).

### b. *The ADEA*

In 1990, Congress enacted the Old Worker's Benefits Protection Act ("OWBPA") as an amendment to the ADEA. Under OWBPA, any employee wishing to waive an ADEA claim must do so in a "knowing and voluntary" manner. 29 U.S.C. § 626(f)(1). To qualify as "knowing

---

6. In *Little,* the plaintiff, like McNamara, participated in this court's employment discrimination mediation program. *Little,* 2005 U.S. Dist. LEXIS 22247, at *1–2. In the presence of assigned *pro bono* counsel, the *Little* plaintiff signed a pre-printed form stating "FOLLOWING MEDIATION THE PARTIES HAVE REACHED A SETTLEMENT AGREEMENT AND WILL FILE APPROPRIATE PAPERS." *Id.* at *2. On the form, the plaintiff also initialed hand-written specific terms of the settlement. *Id.* When presented the next day with a formalized agreement, plaintiff requested to continue litigation. *Id.* The Court

found that plaintiff's refusal to sign the agreement was unjustified and enforced the contract. *Id.* at *5–6. The *Little* stipulation mirrors McNamara's almost exactly. McNamara, in the presence of *pro bono* counsel, signed the pre-printed mediation stipulation form and initialed the hand-written principal terms of the settlement. The *Little* decision, however, does not indicate whether the stipulation in controversy included a "Standard 21 day language" provision as the Stipulation has here. The presence of such a provision is significant.

and voluntary," an ADEA waiver must meet a minimum of statutory requirements. *See* 29 U.S.C. § 626(f)(2)(A)-(H). One requirement is that an employer must give an employee at least twenty-one days to consider the waiver. 29 U.S.C. § 626(f)(1)(F). Another requirement is that an employer must give an employee seven days, following the execution of an ADEA waiver agreement, to revoke it. 29 U.S.C. § 626(f)(1)(G).

### 2. *Application*

■ In moving to enforce the Stipulation, Tourneau argues that the Stipulation is a fully binding contract.[7] Although it acknowledges that the reference in paragraph 6 to "Standard 21 day language" is to the type of language contemplated by OWBPA, it contends that McNamara waived the twenty-one day consideration period and that the seven-day revocation period began to run on March 21, 2006, when McNamara signed the Stipulation. Tourneau further argues that the seven-day period had expired when McNamara wrote his April 17, 2006, letter, advising that he was refusing to settle.[8]

Tourneau's motion thus raises the following issues: (a) did the parties intend to be bound by the Stipulation? (b) if so, did they agree on all material terms? and (c) if so, did the Stipulation permit McNamara to revoke it as late as April 17, 2006? I address each issue in turn.

### a. *Intent to Be Bound*

■ As an initial matter, I conclude that the Stipulation is a fully binding contract. The Stipulation—which both parties signed—clearly states that the parties reached an agreement to settle the case on six principal terms. Additionally, the context of the settlement discussions demonstrates that this was not a mere agreement to continue negotiations in good faith: Both parties were represented by counsel and attended court-ordered mediation to settle a pending lawsuit. Therefore, both parties are bound to the six principal terms set forth in the Stipulation, even though the parties never executed a formal contract.

### b. *Agreement on All Material Terms*

■ Because I conclude that the parties intended to be bound by the Stipulation, I must now determine whether the parties agreed on all material terms. In particular, I must decide whether paragraph 6 of the Stipulation is ambiguous and whether there was a meeting of the minds.

7. When he first requested reinstatement of this action, McNamara argued that Hurd's alleged misrepresentation about his presence at the pre-trial conference tainted the entire mediation process. This argument is meritless. First, to the extent there was a misimpression, Hurd clarified to the mediator that he did not personally attend the pre-trial conference. Second, whether it was Hurd or one of his colleagues who attended the conference is of no moment, for Hurd surely was briefed on what transpired at the conference. Third, McNamara was represented during the mediation by counsel, and if he had felt that any confusion over Hurd's attendance at the conference had tainted the process, he was free to walk away without signing any agreement. Settlement agreements may not be cast aside merely because of an afterthought or a change of heart. *See Rivera v. State*, 115 A.D.2d 431, 496 N.Y.S.2d 230, 231 (1st Dep't 1985).

8. Finally, Tourneau argues that OWBPA applies only to age discrimination claims and not to the disability and other claims asserted by McNamara in this lawsuit. The argument is rejected. While Tourneau is correct that OWBPA requires consideration and revocation periods only for ADEA claims, parties may agree to include consideration and revocation periods for other types of discrimination claims. Parties may bargain, as a contractual matter, for protections beyond what the law requires.

Focusing first solely on the words of the Stipulation, I conclude that paragraph 6 is ambiguous. It is comprised only of the words "Standard 21 day language" and makes no reference to a seven-day revocation period at all. It does not address when any twenty-one day consideration or seven-day revocation period would be triggered. Although the Stipulation provides for the drafting of a formal settlement agreement, it does not specify whether the twenty-one days or any seven-day revocation period would run from the signing of the Stipulation or the subsequent signing of a formal contract. A reasonable person surely could have understood that the consideration and revocation periods would begin after the receipt and signing of a formal agreement.

Because paragraph 6 of the Stipulation is ambiguous, I look to extrinsic evidence to determine the parties' intent. Neither party submitted an affidavit as to what the parties intended by the phrase "Standard 21 day language." The record, however, does contain compelling evidence of the parties' intent—the Proposed Agreement that Tourneau sent McNamara for execution. Drafted by Tourneau's counsel a few days after the mediation, the Proposed Agreement undoubtedly reflected the parties' understanding as to their agreement. I conclude, based on the Proposed Agreement, the language of the Stipulation, and the overall circumstances, that the parties reached a meeting of the minds: They intended that McNamara would have seven days to revoke, from the time he signed a formal settlement agreement.

First, the parties clearly intended to include a seven-day revocation feature, even though the Stipulation did not explicitly include such a provision. The parties understood that the phrase "Standard 21 day language" would include standard seven-day language as well. The provision of OWBPA that requires a twenty-one day consideration period also requires a seven-day revocation period, 29 U.S.C. § 626(f)(1), and most experienced employment lawyers would understand a reference to "Standard 21 day language" to include, in this context, standard seven-day revocation language as well. Tourneau's counsel had precisely that understanding, as he included a seven-day revocation provision when he drafted the Proposed Agreement.

Second, the Proposed Agreement provided that the seven-day revocation period started when plaintiff signed that document, and it made no reference to the date the parties signed the Stipulation. The draft is thus strong evidence that the parties intended the seven-day revocation period to begin when McNamara signed the formal document.

Third, Tourneau's argument that McNamara waived the twenty-one day consideration period makes no sense and is belied by the language of the Stipulation. If Tourneau were correct, there would have been no reason to include paragraph 6 at all. It makes no sense that the parties would include a provision—Standard 21 day language—that would then, immediately upon execution of the document, be deemed waived. Likewise, Tourneau's contention that the seven-day revocation period began when the Stipulation was signed also is illogical. The Stipulation gave Tourneau's counsel five business days to draft a formal agreement, and thus if the parties had intended that the seven-day revocation period commenced when the Stipulation was signed, McNamara would have been left with little time to consider the formal agreement and to revoke the Stipulation.

Thus, although there is some ambiguity in the wording of the Stipulation, its words, the extrinsic evidence, and all the circumstances make the parties' intent

clear. I conclude, as a matter of law, that there was a meeting of the minds.

### c. *Revocation*

█ Thus, the Court concludes that the parties contemplated, in paragraph 6 of the Stipulation, that McNamara would have seven days after the signing of a formal contract to revoke his agreement to settle. Because McNamara elected to revoke before he signed a formal contract, the seven-day revocation period had not yet begun to run. McNamara's April 17, 2006, letter, which he sent within twenty-one days after receiving the Proposed Agreement, was timely. McNamara had a right to change his mind; he did so in a timely fashion; and therefore he is not bound to any of the terms of the Stipulation.

### CONCLUSION

After much effort on the part of many, Tourneau and McNamara seemingly settled their differences. The Court, a volunteer mediator, McNamara's *pro bono* mediation attorney, Tourneau, and Tourneau's counsel all devoted time and energy to this settlement endeavor. Tourneau agreed to pay McNamara $20,000, not an insignificant sum and only $5,000 less than McNamara's initial settlement demand. McNamara, with the advice of counsel, agreed to accept that sum. Yet, purportedly because of some irrational notion that Tourneau's counsel misrepresented to the mediator that he had been present at a pretrial conference, McNamara has had a change of heart, undermining the efforts of all those above.

Nonetheless, for the reasons set forth herein, I conclude that McNamara had the right to revoke. Accordingly, Tourneau's motion to enforce the Stipulation is denied and the case is hereby reinstated. The parties shall complete all discovery, fact and expert, by February 23, 2007. A pre-trial conference will be held on that day at 2 p.m.

SO ORDERED.