Agnes O'CONNOR–GOUN, Plaintiff,

v.

WEILL CORNELL MEDICAL COLLEGE OF CORNELL UNIVERSITY and Ronald G. Crystal, M.D., Defendants.

No. 11 Civ. 7377(JSR).

United States District Court,
S.D. New York.

July 29, 2013.

---

John A. Beranbaum, Beranbaum Menken Ben–Asher & Bierman LLP, New York, NY, for Plaintiff.

Michael Emanuel Delarco, Tracey Ann Tiska, Caroline H. Cheng, Hogan & Hartson L.L.P., New York, NY, for Defendants.

### MEMORANDUM ORDER

JED S. RAKOFF, District Judge.

Plaintiff Agnes O'Connor–Goun brings this action against defendants Weill Cornell Medical College of Cornell University ("WCMC") and Dr. Ronald G. Crystal under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, alleging that the defendants unlawfully terminated her employment with WCMC in retaliation for her blowing the whistle on the defendants' fraudulent misuse of federal research funds. By letter brief, defendants moved to enforce a settlement agreement reached between the parties on January 17, 2013. Plaintiff opposed the motion on the ground that she validly exercised a right to revoke the settlement. On April 22, 2013, the Court issued a "bottom line" order granting defendants' motion. This Memorandum explains the reasons for that ruling and directs the entry of final judgment.

The pertinent facts are not in dispute. In her Second Amended Complaint ("SAC"), plaintiff alleged that from November to December 2010, she was employed at WCMC as Administrator of the Department of Genetic Medicine, reporting directly to Crystal, the Chairman of the Department. Soon after starting in this position, plaintiff allegedly discovered that

Crystal and WCMC were misappropriating federal research funds provided by the National Institutes of Health and were using "two sets of books," in violation of the False Claims Act. SAC ¶ 43. Pursuant to WCMC's false claims policy, plaintiff then allegedly reported the defendants' wrongdoing to a senior WCMC human resources officer, Lisa Abbott, who told plaintiff she would "make every effort" to find plaintiff another job at WCMC. *Id.* ¶ 47. Plaintiff alleged, however, that Abbott and her human resources associates made only nominal efforts to find plaintiff another position, and less than three weeks after she first disclosed the alleged fraud, plaintiff was fired. *Id.* ¶¶ 54–60, 62.

Thereafter, plaintiff filed suit, and the parties commenced discovery. On January 17, 2013, after plaintiff's deposition of Abbott and defendants' deposition of plaintiff, the parties agreed to a settlement, which was memorialized in an exchange of emails between counsel. *See* Decl. of Michael DeLarco in Supp. of Defs.' Mot. to Enforce ("DeLarco Decl."), ¶¶ 4–9; Cert. of John A. Beranbaum ("Beranbaum Cert."), ¶ 5. This settlement included a number of terms, including, as relevant here, an agreement to draft "a more formal agreement." *See* DeLarco Decl., ex. A, at 1.

The parties quickly took steps to perform the settlement. The parties immediately discontinued discovery and cancelled all scheduled depositions. *Id.* The next day, at plaintiff's counsel's initiation, counsel jointly called Chambers to inform the Court of the settlement. *See* DeLarco Decl., ex. B. Plaintiff's counsel also emailed counsel at non-party The American Museum of Natural History ("AMNH") to advise that "[t]he case has settled," and thus AMNH did not have to comply with a pending third-party subpoena for production of documents. DeLarco Decl. ¶ 12; *id.* ex. C.

A week later, however, on January 25, 2013, plaintiff's counsel for the first time spoke with Kenneth Handler, a WCMC human resources employee, whom Abbott allegedly tasked with finding plaintiff a new position at WCMC. Plaintiff's counsel had previously noticed Handler's deposition, but had been unable to speak with him. Handler told plaintiff's counsel that Abbot had explicitly instructed him not to help plaintiff find another job and had told him that "Agnes needs to go away." Beranbaum Cert., ¶¶ 8–9; Cert. of Kenneth Handler, ¶¶ 4–6. If true, that directive squarely contradicted what Abbott told plaintiff. *See* Beranbaum Cert., ¶ 10 (quoting Abbott's deposition testimony that "I recall saying to Agnes that we hired her in good faith and that we wanted to work with her in good faith if we could find a mutually suitable position for which she was interested and qualified"). Handler also stated that he, like plaintiff, had been wrongfully fired by WCMC. *Id.*, ¶ 8. In addition, also on January 25, 2013, another former employee of WCMC called plaintiff's counsel, stating that Handler had recommended that she do so. She explained that she too had been wrongfully terminated by WCMC, and that she knew yet another employee whom WCMC had also treated wrongfully. *Id.* ¶ 7.

Three days later, on January 28, 2013, plaintiff's counsel emailed defense counsel reminding him that he had promised to send over a "draft agreement." DeLarco Decl., ex. D. Later the same day, defense counsel emailed plaintiff's counsel a draft settlement agreement, prominently marked *"DRAFT"* on the first page in bold, italics, and all capital letters, reflecting the terms of the January 17 settlement, as well as a draft stipulation of dismissal. DeLarco Decl., ex. E. Two days

later, on January 30, 2013, defense counsel sent another email to plaintiff's counsel, stating that there was "one more review of the agreement forthcoming from my client.... My guess is the comments/revisions will be minor. I assume this will not create a problem since I have not yet heard back from you on the initial draft." DeLarco Decl., ex. F, at 1. Later that day, defense counsel sent plaintiff's counsel a revised version of the agreement, still prominently marked as a draft, with the client's minor changes. *Id.*, attachment ("Jan. 30 Draft Agreement").

The January 30 draft agreement reflected the terms of the January 17 agreement, as well as a number of new terms. Most important for present purposes, the draft agreement contained a new term giving plaintiff 21 days from transmission to review the agreement and 7 days from signing to revoke it. *Id.*, ¶ 16. The day after plaintiff's counsel received the January 30 draft agreement, plaintiff signed the draft and, more or less simultaneously, signed a document revoking the draft just signed. Plaintiff's counsel emailed these documents to defense counsel on February 1, 2013. DeLarco Decl., ex. G.

Defendant then moved to enforce the prior January 17 settlement agreement memorialized in counsel's emails. Plaintiff opposed, arguing that the January 17 agreement had been superseded by the January 30 draft agreement that plaintiff had signed. Plaintiff further argued that she had then validly revoked her acceptance of the January 30 draft agreement, leaving no enforceable agreement at all. In the alternative, plaintiff argued that even if the January 30 draft agreement had not superseded the January 17 agreement, the January 17 agreement contained

a right to revoke implied by law under the Older Worker Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626(f)(1), which plaintiff had validly exercised. The Court addresses these two arguments in turn.

 Plaintiff's first argument concerns whether the January 30 draft agreement was binding and enforceable. This is a simple question of contract formation governed by the four factors announced in *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1985), which "help determine whether the parties intended to be bound in the absence of a document executed by both sides." *Id.* at 80. *Winston* directs courts to consider "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Id.*[1] Here, contrary to plaintiff's contention, none of these factors suggests that defendants intended to be bound by the January 30 draft agreement.

As to the first factor, although the January 30 draft agreement does not contain an express reservation of the right not to be bound, the language of the document and the surrounding negotiations clearly indicate defendants' intention not to be bound until the agreement was finalized and fully executed. *See Lindner v. Am. Exp. Corp.*, No. 06 Civ. 3834(JGK), 2007 WL 1623119, at *6 (S.D.N.Y. June 5, 2007) ("Although this factor is phrased in terms of 'express' reservations, courts—including the court in *Winston*—also analyze whether the par-

---

**1.** *Winston* applied New York law, which is also the relevant law here. *See* Jan. 30 Draft Agreement, ¶ 12 ("This Agreement shall be governed by the laws of New York without regard to conflicts of law principles....").

ticular facts and circumstances of the case—such as the nature of the negotiations or the language of any draft agreements—demonstrate an implied reservation of the right not to be bound until the execution of a written agreement.").

To begin with, the document is prominently labeled *"DRAFT,"* and counsel for both sides described it as a draft in their correspondence. *See* DeLarco Decl., ex. D ("Mike, You were going to send over a draft agreement."); *id.,* ex. E ("Attached please find a draft settlement agreement. . . ."). In addition, the draft contained blank spaces regarding how the settlement payment was to be allocated as between plaintiff and her counsel, indicating that, at least in defendants' minds, that issue remained open and in need of resolution. Similarly, the draft contained blank signature blocks for plaintiff and each of the defendants, accompanied by language stating, "To signify their assent to the terms of this Agreement, the parties have executed this Agreement. . . ." Jan. 30 Draft Agreement, at 4–5. Although this language "is not the equivalent of a provision that [the agreement] is *not* binding *until* it has been so executed," *Kowalchuk v. Stroup,* 61 A.D.3d 118, 873 N.Y.S.2d 43 (N.Y.App.Div.2009), it nevertheless provides yet further evidence that defendants regarded the unsigned document as a non-final, nonbinding draft.

Finally, the draft contained a merger clause stating that the agreement "contains the complete understanding of the parties," and "[n]o other promises or agreements shall be binding or shall modify this Agreement unless reduced to writing and signed by the parties hereto or counsel for the parties." Jan. 30 Draft Agreement, ¶ 10. It would be passing strange for the parties to agree that any binding modification must be reduced to writing and fully executed if they did not

also understand that the initial agreement itself had similarly to be fully executed in order to become enforceable. For that reason, "[t]he presence of such a merger clause is persuasive evidence that the parties did not intend to be bound prior to the execution of a written agreement." *Ciaramella v. Reader's Digest Ass'n, Inc.,* 131 F.3d 320, 324 (2d Cir.1997). The Court accordingly has no difficulty concluding that defendants plainly reserved their right not to be bound by the January 30 draft agreement.

Turning to the second *Winston* factor, defendants convincingly argue that, in contrast to the parties' immediate performance on the January 17 settlement agreement, there was no partial performance of the January 30 draft agreement. Indeed, as soon as plaintiff's counsel informed defense counsel that plaintiff had signed the draft agreement and then revoked, defense counsel objected. DeLarco Decl., ¶¶ 18–22. Defendants then immediately moved to enforce the earlier January 17 settlement agreement. Plaintiff offers no argument to the contrary. This factor clearly favors defendants.

As to the third *Winston* factor, the terms of the January 30 draft agreement were not all agreed upon, since the draft contained blank spaces regarding the division of the settlement payment between plaintiff and her counsel. Plaintiff argues that these blank spaces were immaterial to the agreement between plaintiff and defendants, noting that "[t]he law of New York is clear that a contract will not fail for indefiniteness unless the matters left open are material." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,* 487 F.3d 89, 96 (2d Cir.2007). Plaintiff also claims that her counsel in fact told defense counsel the proper division before January 30, *see* Beranbaum Cert., ¶ 6,[2] and thus, even

---

2. Defendants dispute this assertion. *See* Reply Decl. of Michael DeLarco in Further

if the incomplete terms were material, "[t]he terms of agreement ... can be readily determined." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 548 N.Y.S.2d 920, 548 N.E.2d 203, 208 (1989).

These arguments, however, misapprehend the nature of the Court's inquiry on this motion. To be sure, it is well settled that *"[w]here the parties have intended to conclude a bargain,* uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract." Restatement (Second) of Contracts § 33, cmt. a (1981) (emphasis added).[3] But the question presented in this case is precisely whether "the parties have intended to conclude a bargain," *id.*, and "[t]he fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance." *Id.* § 33(3). In that regard, "[i]t is not for the court to determine retrospectively that at some point in the evolution of a formal document ... the changes being discussed became so 'minor' or 'technical' that the contract was binding despite the parties' unwillingness to have it executed and delivered." *Winston,* 777 F.2d at 83 (2d Cir.1985). Here, even assuming that the information to be provided

in the blank spaces was immaterial and had been discussed in the parties' negotiations, the fact remains that the January 30 draft agreement is facially incomplete. That fact supports the conclusion that defendants did not intend to be bound by it.[4]

The final *Winston* factor concerns whether the contract at issue is of a type usually committed to a fully executed writing. Here, the parties agreed on January 17 that they would subsequently draft "a more formal agreement." DeLarco Decl., ex. A, at 1. While the January 30 draft agreement is in some sense "more formal" than the bullet-point email agreement exchanged between counsel on January 17, it strains credulity to suggest that an unexecuted, facially incomplete document prominently labeled as a "draft" was what the parties had in mind as a "more formal agreement." The Court thus concludes that this factor too favors the defendants.

■ Since all four *Winston* factors indicate that the defendants did not intend to be bound by the January 30 draft agreement, that agreement is unenforceable, and plaintiff's attempt to accept and then revoke that agreement is of no legal effect. Since plaintiff does not dispute that the January 17 settlement agreement was

Supp. of Defs.' Mot. To Enforce, ¶ 6 ("Rather, Mr. Beranbaum informed me that the Settlement Payment would 'probably' be split evenly between he and his client, but that he would 'have to get back to' me."). The Court need not resolve this factual dispute to decide this motion.

3. The Court notes that *Winston* relies on a nearby section of the Restatement (Second) of Contracts. *See Winston,* 777 F.2d at 81 (citing Restatement (Second) of Contracts § 27, cmt. c (1981)).

4. Defendants also argue that the terms of the January 30 draft agreement were not fully agreed upon because before plaintiff communicated her acceptance and revocation of the

January 30 agreement to defendants, a dispute arose over the scope and intent of the review and revocation provision plaintiff now relies upon. In particular, during a telephone conversation on February 1, defense counsel asserted to plaintiff's counsel that the review and revocation provision "was only intended to apply to a release of potential age discrimination claims." DeLarco Decl., ¶ 20. But this dispute went only to the intended effect of the review and revocation provision, and not to the English words that the parties desired to include in that provision. Accordingly, for purposes of the *Winston* analysis, this term of the January 30 draft agreement was not in dispute.

binding and enforceable when made, it remains only to address plaintiff's alternative argument that the January 17 settlement agreement contained a review and revocation provision implied by law under the OWBPA, which plaintiff then validly triggered.

Passed in 1990, the OWBPA amended the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, and "imposes specific requirements for releases covering ADEA claims." *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 424, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998). In particular, the OWBPA provides that "[a]n individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary," and "a waiver may not be considered knowing and voluntary unless at a minimum" certain requirements are met. 29 U.S.C. § 626(f)(1). As relevant here, the OWBPA requires that "the individual [be] given a period of at least 21 days within which to consider the agreement," and that "the agreement provide[ ] that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement." *Id.* § 626(f)(1)(F)(i), (f)(1)(G).

Here, the January 17 settlement contains a general release, thus purporting to waive any claims plaintiff may have under the ADEA, and the agreement clearly did not contain the necessary terms to render that waiver "knowing and voluntary" under the OWBPA. Plaintiff's contention is that, as a result, a review and revocation provision consistent with the requirements of the OWBPA should be deemed to have been implied in the January 17 settlement as a matter of law. Plaintiff further argues that that implied review and revocation provision should be deemed to permit plaintiff to revoke the January 17 agreement not only insofar as it released her

ADEA claims, but as to all claims, including those pressed in her Second Amended Complaint.

■ But this argument rests on a faulty premise-to wit, that where a settlement purporting to release claims under the ADEA fails to include an appropriate review and revocation provision, the OWBPA causes such a provision to be inserted into the release by operation of law. The OWBPA does no such thing. Rather, as explained above, the statute's operative language provides that "[a]n individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary," and "a waiver may not be considered knowing and voluntary unless," *inter alia*, it includes the required review and revocation provisions. 29 U.S.C. § 626(f). Put differently, the statute simply provides that where a release fails to comply with the OWBPA, the individual "may not waive any right or claim under [the ADEA]." The statute says nothing about, and has no effect on, non-ADEA claims. *See Branker v. Pfizer, Inc.*, 981 F.Supp. 862, 867 (S.D.N.Y.1997) ("[F]ailure to comply with the OWBPA cannot invalidate release of Branker's claims under the NYCHRL or NYSHRL, since the provisions of the OWBPA apply only to the ADEA and not to state law claims."); *Cordoba v. Beau Dietl & Associates*, No. 02 Civ. 4951(MBM), 2003 WL 22902266, at *7 n. 6 (S.D.N.Y. Dec. 8, 2003) ("Non-compliance with the OWBPA provisions does not invalidate Cordoba's release of her Title VII, NYSHRL, or NYCHRL claims because the OWBPA applies only to ADEA claims.").

Here, since the January 17 settlement contained a general release but did not include any review or revocation provision, plaintiff's purported release of her ADEA claims is invalid. However, the invalidity of that portion of the general release is

irrelevant to the instant motion, since plaintiff has not asserted an ADEA claim in this case, and, in any event, she concedes that any such claim would now be time-barred. *See* Pl.'s Post–Argument Letter Br., at 2. Plaintiff's alternative argument thus fails.[5]

Accordingly, for the foregoing reasons, the Court confirms its "bottom line" Order of April 22, 2013 granting defendants' motion to enforce the settlement. Clerk to enter final judgment.

SO ORDERED.

---

**5.** In making her alternative argument, plaintiff relies heavily on *McNamara v. Tourneau, Inc.*, 464 F.Supp.2d 232 (S.D.N.Y.2006), in which Judge Chin held that a plaintiff had validly revoked a settlement within the time period contemplated by an express provision included in a written stipulation. *Id.* at 234. That case has no bearing where, as here, the settlement agreement in question contains no express review and revocation provision.