DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**TRITON STONE HOLDINGS, L.L.C., LOTUS BUSINESS, L.L.C., JOSH KELLER,** and **RANDY C. MATHIS,**
Appellants,

v.

**MAGNA BUSINESS, L.L.C., DECIO MAGNANI, VOLANZ, L.L.C.**, and **LANDER AMERICA, INC.,**
Appellees.

No. 4D19-2371

[November 18, 2020]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Carol-Lisa Phillips, Judge; L.T. Case No. CACE18-006014.

Christopher N. Bellows of Holland & Knight LLP, Miami, for appellants.

Keith T. Grumer of Katz Barron, Fort Lauderdale, for appellees.

CURLEY, G. JOSEPH, Associate Judge.

The Defendants below appeal from the trial court's final judgment in favor of the Plaintiffs, finding, among other things, that the parties' handwritten document was an enforceable contract, and that the parties had commenced performance, thereby manifesting an intent to be bound by the agreement. The Defendants' primary argument is that the final judgment must be reversed because the parties did not agree to all essential terms necessary for a lawful transfer of membership interests in an LLC entitled "Lotus." We agree with the Defendants and reverse.

### *Lotus*

Lotus is a Florida limited liability company in the business of importing and distributing ceramic products and mosaic tiles. The company is governed by an operating agreement. Lotus consisted of four members, all of which are business entities: Magna Business, L.L.C. ("Magna"); Volanz, L.L.C. ("Volanz"); Lander America, Inc. ("Lander"); and Triton Stone

Holdings, L.L.C. ("Triton"), and each of which are participants in this litigation.

In 2012, Lotus was formed by Decio Magnani ("Magnani") and Juliano Kramer ("Kramer"), the principals of Magna and Lander, respectively. In 2015, Lotus admitted two additional members, Volanz and Triton. Notably, Lotus's operating agreement was amended in accord with its dictates. The members agreed that Lotus would distribute Triton's products—such as granite and quartz slabs and plumbing products—in addition to the ceramic and mosaic products it already imported. Magnani, Magna's principal, would serve as Lotus's general manager. The parties struggled in their merged operations.

### Later Efforts to Restructure Lotus

The Lotus members met in 2016 to discuss future options. They agreed to restructure the company by removing Magnani as general manager, replacing him with Triton's principal, Josh Kessler ("Kessler"). It was also agreed that Magnani would continue to manage the day-to-day operations of the mosaic business, and Kessler would assume Lotus's corporate and financial responsibilities. It is worthy of comment that the operating agreement was amended to reflect the change in corporate management responsibilities.

Despite the company's restructuring, the business continued to struggle. In May 2017, the parties agreed they needed to find a solution or part ways. In August 2017, Kessler emailed the Lotus members' principals, asking that they meet on August 22 and 23 to discuss capital contributions and the company's future.

What the parties refer to as the "Dunkin Donuts meeting" took place over two days in a Dunkin Donuts conference room near Lotus's main office. It was decided that Triton would buy the other members' participation units in Lotus. The group valued the company at $1.9 million.

Volanz's principal, Ricardo Diaz ("Diaz"), drafted a handwritten document on notebook paper outlining the amounts payable to Volanz, Magna, and Lander. The document provided that: "[parties] will sign contracts and promissory notes as per pages 2 and 3." Those pages, in turn, described the future contracts for the sale of membership participation units by: (1) Volanz to Triton; (2) Lander to Triton; and (3) Magna to Triton. Promissory notes were to be issued to Volanz and Lander.

Additionally, the handwritten document referenced many terms, which included:

(1) term: 32 months;
(2) governing law: Florida;
(3) right to prepay: Yes;
(4) joint and several guarantors: Josh Kessler, Randy Mathis, and Triton;
(5) costs and fees in the event of default: 10% of $1,135,250; and
(6) interests: none.

The document also provided that "Decio [Magnani] would leave the company as soon as he receives payment." Initially, the parties discussed that Magnani would receive a severance package. The severance package provision, however, was stricken from the document after Magnani agreed to forgo severance in exchange for Triton's promise to make a lump sum payment for Magna's membership interest.

Kessler, Mathis, Diaz, Gayoso, and Kramer signed the handwritten document prepared by Diaz. The handwritten document did not indicate the capacity in which the individuals were signing, nor did it set a closing schedule or reference the operating agreement requirements. Despite its subject being the sale and transfer of membership interests in Lotus, the agreement makes no reference to the operating agreement or its dictates for completion of a "valid" transfer.

*Events Following the Meeting*

Triton fired Magnani the very next morning. Magnani then contacted Kessler asking for payment. A few days later, Kessler caused Lotus to issue a check to Magna for $25,000. The memorandum line on Lotus's internal record states the purpose of the check was: "DEPOSIT PAYMENT OF 100% SHARES."

A few months later, Lotus issued a second check payable to Magnani for $12,500. After the second payment, Magnani texted Kessler again to request payment. Kessler replied in a text message:

> *Hey bud. You know. I don't disagree with you I wish my partners and I could all pay as we agreed but together putting money on the business, we can't agree to come up with the money just to pay all the bills.*

Two months later, Kessler sent Magnani a written offer by Triton to pay Magnani fifty thousand dollars' worth of tile inventory as final payment for

3

Magna's membership interest.  The written offer also included a twenty-four month non-compete covenant that prohibited Magnani from soliciting Lotus's clients.  Magnani refused the offer.

In March 2018, Kessler explained in an email to Magnani's counsel that Triton was unable to make payment.  Kessler stated that the parties needed a formal contract before any payment was made.  He explained that the Plaintiffs had sent Triton a formal contract based on the terms commemorated in the handwritten outline, but Triton's attorneys did not consider it acceptable.

Soon after, Magnani and the three selling members sued Triton, Kessler, and Mathis for breach of contract.  They did not sue Lotus.  The Plaintiffs sought to enforce the handwritten document and the personal guarantees.  In response, the Defendants assert that:

(1) the handwritten agreement was merely an outline and proposal for a future contract;
(2) the agreement was ambiguous and devoid of essential terms;
(3) the agreement was signed by Kessler and Mathis in their individual capacity and not by Triton; and
(4) there was no meeting of the minds on all essential terms.

The trial court entered final judgment in favor of the Plaintiffs, finding, among other things, that the parties' handwritten document was an enforceable contract, and that the parties had commenced performance, thereby manifesting an intent to be bound by the agreement.

### *Arguments on Appeal*

The Defendants' primary argument is that the final judgment must be reversed because the parties did not agree to all essential terms necessary for a lawful transfer of Lotus membership interests.  The Defendants assert that the Lotus operating agreement dictates the manner for any enforceable Lotus membership transfer.  These transfers were not referenced in the Dunkin Donuts agreement or otherwise performed.

Even though the express terms of the Lotus operating agreement provide that a transfer is only valid once the operating agreement is amended to account for the terms of the transfer, the handwritten agreement does not mention any conditions or procedures for the conveyance of the Lotus membership interests.  The operating agreement also requires that it be signed by the transferee to effectuate a transfer.

4

In furtherance of their argument that this was nothing more than an agreement to agree, the Defendants also note that the handwritten document expressly provided that formal contracts and promissory notes would be prepared and signed by the parties.

The Plaintiffs attempt to counter this argument by suggesting that the record contains competent substantial evidence to support the trial court's conclusion that the handwritten document is an enforceable and binding contract. They claim that the handwritten agreement contained all of the essential terms, which include the identity of each seller, their membership units, the sale price, and the payment terms. Further, the document shows that Magna, Lander, and Volanz offered to sell Triton their membership interests in exchange for the indicated sale price. The agreement further provided that Magnani would leave the company upon receiving full payment for his membership interest.

The Plaintiffs assert that Triton manifested its acceptance of an agreement by: (1) texting the Plaintiffs they intended to pay "as agreed"; (2) excluding the Plaintiffs from participating in Lotus; and (3) by partially paying Magnani for his membership interest. Triton also informed third parties that Triton had purchased the entire company and did not allow Magnani to attend industry trade shows on behalf of Lotus. Additionally, Triton retained profits for its own benefit and made no reports to the other members regarding the company's status.

The Plaintiffs suggest that *Fineberg v. Kline*, 542 So. 2d 1002, 1004 (Fla. 3d DCA 1988), is instructive. In that case, the Third District explained that a party who "accepts the proceeds and benefits of a contract" remains subject to "the burdens the contract places upon him." *Id.* Accordingly, defendants are estopped from repudiating their obligation to pay the amounts indicated in the agreement. In *Kline,* however, while assent was lacking, there was agreement or performance concerning all essential terms. *Id.* The missing assent or terms were provided by the parties' performance. Here, the Defendants argue that essential terms are missing and have not been provided by performance. At most, the Defendants assert, the parties agreed to agree.

In response to the fact that the handwritten document did not comply with the Lotus operating agreement restrictions on transfers, the Plaintiffs posit that the issue was not preserved for appellate review as it was not raised below.[1]

---

[1] The Plaintiffs also argued that even if compliance with the Lotus Operating Agreement was raised as an issue at trial, it was moot because unanimous action

5

## Standard of Review

A decision interpreting a contract presents an issue of law that is reviewable by the de novo standard of review. *See Mgmt. Computer Controls, Inc. v. Charles Perry Constr., Inc.*, 743 So. 2d 627, 630 (Fla. 1st DCA 1999). When the trial court's decision is based in part on factual findings, it presents a mixed question of law and fact. *See Fonte v. AT&T Wireless Servs., Inc.*, 903 So. 2d 1019, 1023 (Fla. 4th DCA 2005) (citation omitted). "The standard of review applicable to the trial court's factual findings is whether they are supported by competent, substantial evidence." *Id.*

"The basic elements of an enforceable contract are offer, acceptance, consideration, and specification of essential terms." *Jericho All-Weather Opportunity Fund, LP v. Pier Seventeen Marina & Yacht Club, LLC*, 207 So. 3d 938, 941 (Fla. 4th DCA 2016). "The question of whether the parties intended to form a binding contract is determined by examining the language of the document in question and the surrounding circumstances." *Midtown Realty, Inc. v. Hussain,* 712 So. 2d 1249, 1251–52 (Fla. 3d DCA 1998). Moreover, if the parties prescribe terms to effectuate a binding agreement, such terms are controlling. Where the parties intend that there will be no binding contract until the negotiations are reduced to a formal writing, there is no contract until that time. *Club Eden Roc, Inc. v. Tripmasters, Inc.,* 471 So. 2d 1322, 1324 (Fla. 3d DCA 1985); *see also Housing Auth. of City of Fort Pierce v. Foster,* 237 So. 2d 569 (Fla. 4th DCA 1970).

The party seeking to enforce a purported agreement has the burden of establishing assent to the essential terms by the opposing party. *Carroll v. Carroll,* 532 So. 2d 1109, 1109 (Fla. 4th DCA 1988). "The definition of 'essential term' varies widely according to the nature and complexity of each transaction and is evaluated on a case-by-case basis." *Lanza v. Damian Carpentry, Inc.*, 6 So. 3d 674, 676 (Fla. 1st DCA 2009).

by the members would render any requirement in the Lotus Operating Agreement unnecessary. The Plaintiffs cited to section 608.4231(6), Florida Statutes (2012), which according to the Plaintiffs provides that "decisions of the . . . managing members shall be made by majority vote of . . . managing members if at a meeting, or by *unanimous written consent.*" (emphasis added). In response, the Defendants correctly noted that Chapter 608 was repealed and replaced by Chapter 605 (the new Limited Liability Company Act) in 2013. Under the current law, the operating agreement controls and governs all relations between the members and Lotus. § 605.0105(1)(a), Fla. Stat. (2017). Thus, the argument is governed, and in this case largely resolved, by the strictures of the Lotus operating agreement.

When determining whether there has been a meeting of the minds on all essential terms, courts should distinguish preliminary negotiations from a final agreement. A Florida appellate court outlined some of the practical issues arising in an assessment of whether an enforceable contract was reached during negotiations:

> Preliminary negotiations or tentative and incomplete agreements will not establish a sufficient meeting of the minds to create an enforceable agreement. Nor may an agreement be determined to be final where the record establishes that it is the intent of the parties that further action be taken prior to the completion of a binding agreement. Applications of these principles help assure that parties to litigation will not unintentionally be deprived of their access to a judicial determination, and that parties and their legal representatives will negotiate without fear of unintentionally entering into a binding agreement.

*Williams v. Ingram*, 605 So. 2d 890, 893–94 (Fla. 1st DCA 1992) (internal citations omitted).

The Defendants argue that the handwritten document is not an enforceable agreement because it left open essential terms for future negotiation. They contend that the Lotus operating agreement prescribes the necessities for a valid agreement, which were not within the Dunkin Donuts agreement and were not provided by performance. They assert there was no evidence that these terms were ever negotiated or agreed on. As a fundamental example, a closing or transfer date is not specified, nor is there any evidence that a transfer of the Lotus membership interests occurred or that anyone, including Magnani, tendered their interests.

Rather than offer evidence of these terms, the Plaintiffs argue that the Defendants did not preserve these arguments for appeal. In response, the Defendants correctly note that in a bench trial, the insufficiency of the evidence is properly raised for the first time on appeal. *H.D. v. Dep't of Children & Families*, 964 So. 2d 818, 819 (Fla. 4th DCA 2007) (in a bench trial, the insufficiency of evidence is properly raised for the first time on appeal).

The Defendants also claim that the operating agreement required Lotus to obtain legal and tax advice prior to any transfer. The Defendants argue that this language is controlling, and, therefore, the handwritten document is not a valid agreement for the transfer of the membership interests. This portion of the Defendants' argument fails because the

operating agreement states quite clearly that a failure to obtain this advice "shall not invalidate any such transfer."

The Defendants, however, present a dispositive argument regarding the document's failure to address the mandatory terms related to the transfer of membership interests. The operating agreement provides that "[n]o transfer . . . of membership rights in the company (a 'transaction') *shall be valid* unless made pursuant to a writing that sets forth all material terms of the transaction . . . ." The operating agreement also provides that "no transfer . . . shall be valid *unless the transferee or grantee signs this [Operating] Agreement as appropriately amended to take account of the terms of the transfer . . . ."* (emphasis added).

Here, the handwritten document stated the sale price, the installment payments, the sellers, and other general conditions. The document, however, provided no details concerning the transfer of the membership interests, which was the purpose of the parties' discussions. Among other things, there is no mention of a closing date, issuance and transfer of certificates, releases, indemnification, or mandatory execution of the operating agreement or amendment.

*Theocles v. Lytras*, 518 So. 2d 936 (Fla. 3d DCA 1987), is instructive in this instance. There, the parties were partners in a restaurant business. *Id.* at 936. The appellant argued that the parties agreed that one partner would buy the other's interest in the business. *Id.* The Third District concluded that the record was devoid of competent evidence of a firm agreement or of the terms essential to an enforceable agreement. *Id.* at 937. Significantly, the Third District noted, stock in the corporate entity had never been issued, and there were no agreements or discussions regarding a closing date, releases, tax and other liabilities, or obligations to the owner of the business premises. *Id.*

Similarly, in *Midtown Realty, Inc.*, the Third District held that a two-page letter of intent regarding the sale of a gas station was not a binding contract but simply an agreement to agree. The court explained that the sale of a gas station was a complex situation that included environmental concerns, the attainment of licenses and government approval, and the financing of a large sum of money. 712 So. 2d at 1252. Thus, the court said, it was reasonable to conclude that the parties did not intend to be bound by a *skeletal* letter of intent. *Id.* (emphasis added).

Here, the record evidence shows that the parties intentionally left open essential terms for future consideration. Given that the purpose of a contract would be to transfer membership interests, the parties would

have had to eventually discuss and agree on the method and timing of conveyance and the subsequent mandatory amendment of the operating agreement. If the parties prescribe terms to effectuate a binding agreement, such terms are controlling. *See Club Eden*, 471 So. 2d at 1324 (where the parties intend that there will be no binding contract until the negotiations are reduced to a formal writing, there is no contract until that time); *see also Housing Auth. of City of Fort Pierce*, 237 So. 2d 569 (Fla. 4th DCA 1970), and *Capital Asset Research Corp. v. Michael Swerdlow Co., Inc.*, 743 So. 2d 43, 44 (Fla. 4th DCA 1999) (where commitment to a binding agreement is expressly conditioned upon execution in a certain manner, an enforceable agreement does not exist until that specified condition is satisfied). These terms are essential to the transaction, and their absence is conclusive evidence that the parties did not reach a binding contract to transfer interests in Lotus.

Here, the Lotus Operating Agreement governed the manner that would effectuate a valid, binding transfer. It was likewise undisputed that the express conditions within the Lotus Operating Agreement were unaddressed in the handwritten agreement and completely unsatisfied. Therefore, in accord with the governing document, to wit, the Lotus Operating Agreement, a binding transfer agreement was not created. Rather, at most, the parties constructed an agreement to agree that was to be formalized in an appropriate manner as prescribed by the Lotus Operating Agreement.

The Plaintiffs concede that under Florida law, agreements to agree are not enforceable as a matter of law. Nevertheless, they claim that the Defendants manifested their assent and formed a binding contract by partially performing and enjoying the benefits of the agreement. Assent can be manifested when all material terms are addressed. Here, that is not the case. Mainly, the Plaintiffs argue that the Defendants began performance by paying Magnani part of the money allegedly owed to Magna. While partial payment did occur, it did not provide missing essential terms. For example, had the interests been conveyed or even tendered, the lack of a closing date might be removed as a missing essential term. This essential term, however, remained open and unaddressed, like several others.

Moreover, this factor does not cure the absence of a meeting of the minds as to the material terms of the transaction. In *Club Eden*, the Third District held that partial payment based on a memorandum of intent did not create a binding contract where the memorandum was clear that no rights or obligations would arise until the execution of an agreement containing all terms and conditions. 471 So. 2d at 1324. Here too, the

handwritten document clearly indicated that the parties were to execute formal contracts and promissory notes. Just as important, the draft left open key terms related to the transfer of the membership interests as required by the Lotus operating agreement.

The record also suggests that the Plaintiffs themselves did not believe the handwritten document was a final, binding agreement. They acknowledged sending a formal draft of the contract to Triton for further review and approval.

"A party's partial performance does not necessarily indicate a belief that the other side is bound. A party may make some partial performance merely to further the likelihood of consummation of a transaction it considers advantageous." *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 502 (S.D.N.Y. 1987).

The Plaintiffs' argument that Triton and Kessler never denied the existence of the agreement and mentioned paying the money "as we agreed" is also not dispositive. Kessler testified that he believed the handwritten document was an agreement or proposal to enter a future contract. It is therefore reasonable that he would refer to the proposal as an agreement.

Finally, the Plaintiffs' argument that the Defendants are estopped from disclaiming the contract because the Plaintiffs "changed their position" and the Defendants "accepted the benefits" is unpersuasive as well. Triton never received the benefit of the bargain, that is, the membership interests in Lotus.

For the reasons above, it is clear that the trial court erred in determining that the purported agreement was an enforceable contract. The handwritten draft did not contain essential terms, which must include the mechanisms and conditions related to the legal transfer of the membership interests. Accordingly, final judgment for the Plaintiffs is reversed and remanded with instructions to grant appropriate relief.[2]

*Reversed and remanded with instructions.*

---

[2] Other arguments were advanced by the Defendants, which include the fact that Lotus was not a target of the Complaint nor did it participate in the trial. Nevertheless, Lotus was the subject of relief within the Final Judgment. While this was also error, this issue and others raised are moot in light of the decision above. Accordingly, they are not necessary for further review or consideration.

GROSS and KUNTZ, JJ., concur.

\*          \*          \*

*Not final until disposition of timely filed motion for rehearing.*